YVONNE T. RODRIGUEZ, Justice
In this contract dispute arising out of a highway construction project, subcontractor Vernco Construction obtained a multimillion-dollar verdict against its former Corporate Vice President David Nelson and against prime contractor E.E. Hood & Sons, Inc. (Hood) after Hood fired Vernco and hired Nelson's own private construction company, Collective Contracting, Inc., to finish certain subcontracted sewer work.
Although the procedural issues at play are complex, Vernco-alleging causes of action for breach of contract, tortious interference with a contract, breach of fiduciary duty, and fraud/conspiracy to defraud-essentially accuses Hood and Nelson of conspiring to sabotage Vernco's subcontract so that Nelson's personal company could then step in, perform work, and receive money that should have gone to Vernco. Hood and Nelson contend there was no conspiracy; rather, Vernco's financial troubles and alleged misappropriation of funds ultimately led to a lapse in insurance coverage at the construction site, which gave Hood good cause to terminate Vernco's subcontract and hire Nelson's company to finish the job. Hood also insists it has already paid Vernco all monies legally owed per the terms of the Vernco Subcontract. Following trial, the jury sided with Vernco on all causes of action.
Hood and Nelson seek reversal of the judgment on multiple grounds. We reverse and render in part on the issue of attorney's fees, reform the remainder of the judgment to reflect liability on breach of fiduciary duty grounds rather than breach of contract grounds, affirm the judgment as modified as to all issues except lost *730 profit damages, and suggest a remittitur on lost profit damages.[1]
I.
BACKGROUND
A.
Factual History
Setting the Stage: Vernco, Hood, and the Applewhite Project
In February 2004, after soliciting bids for a large construction project aimed at bolstering road and utilities infrastructure around the site of a proposed Toyota plant south of San Antonio, Texas (the Applewhite Project), the Texas Department of Transportation (TxDOT) ultimately awarded a prime contract to E.E. Hood & Sons, Inc. (Hood). Hood, in turn, hired Vernco Construction, Inc., as its subcontractor for water utility services. Hood had previously hired Vernco as a subcontractor on a different project (the Pat Booker Project). Jack Claflin was the owner/president of Vernco. Corporate Vice President David Nelson headed Vernco's water utility services division and was largely the point person between Vernco and Hood for both the Pat Booker Project and the Applewhite Project. While this case primarily involves a dispute over the Vernco's work on the Applewhite Project, as a side issue, Vernco alleges that Nelson told the company that as a result of delays on the Pat Booker Project, Vernco would be entitled to between $150,000 and $170,000 in inefficiency claims from TxDOT. According to Claflin, Nelson represented that he would file those claims on Vernco's behalf. It is undisputed that Nelson did not timely file the Pat Booker project inefficiency claims.
Relevant Terms of the Applewhite Project Prime Contract and the Vernco Subcontract
The Applewhite Project's Prime Contract between TxDOT and Hood incorporated by reference the provisions of TxDOT's 1993 Standard Specifications for Construction and Maintenance of Highways, Streets, and Bridges (also known as the "Blue Book"). Germane excerpts of the Blue Book and subsequent change orders modifying the Prime Contract will be discussed later in this opinion.
Prime contractor Hood, in turn, signed a subcontract for utilities services with Vernco (the Vernco Subcontract). Relevant to this appeal are five sections of the Vernco Subcontract.
Payment Arrangement
Section 3(e) of the Vernco Subcontract details the payment arrangement between the parties and places restrictions on what Vernco may do with the money it receives from Hood:
Section 3. PAYMENT. (a) The Contractor agrees to pay the Subcontract for the performance of this Subcontract, as specified herein, the sum of Two Million Two Hundred Nunety [sic] Two Thousand Three Hundred Eleven and Ninety Four Hundredths dollars ($2,292,311.94 [sic] ) subject to additions and deductions for charges agreed upon or determined, as herein after provided. Partial payments will be made to the Subcontractor each month in the amount equal to 95 per cent of the value ... of the quantity ... of the work performed hereunder, less the aggregate of previous payments.... Upon complete performance of this Subcontract by the *731 Subcontractor and final approval and acceptance of Subcontractor's work and materials by the Owner, the Contractor will make final payment to the Subcontractor of the Balance due to him under this Subcontract no sooner than 10 days after full payment for such work and materials has been received [sic] by the Contractor from the Owner.
...
(c) Contractor reserves the right to make payment by joint check or by direct check to Subcontractor's materialmen or sub-subcontractors or any person who has right of action against Contractor or Contractor's Surety under any law. Subcontractor agrees that contractor reserves the right of determination as to what manner of payment shall be made.
...
(e) The Subcontractor agrees and covenants that money received for the performance of this Subcontract shall be used solely for the benefit of persons and firms supplying labor, materials, supplies, tools, machines, equipment, plant or services exclusively for this project in connection with this Subcontract and ... any money paid to the Subcontractor pursuant to this Subcontract shall immediately become and constitute a trust fund for the benefit of said persons and firms, and shall not in any instance be diverted by Subcontractor to any other purpose until all obligations arising hereunder have been fully discharged, and all claims arising therefrom have been fully paid.... [Emphasis in orig.].
Changes to the Scope of Work and Price Adjustments
Section 4 of the Vernco Subcontract deals with how changes and adjustments in the scope of work and the amount of money owned to Vernco will be handled:
Section 4. CHANGES. The Contractor may at any time by written order of Contractor's authorized representative, and without notice to the Subcontractor's sureties, make changes in, additions to and deletions from the work to be performed and materials to be furnished under this Subcontract, and the Subcontractor shall promptly proceed with the performance of this Subcontract as so changed. Any increase or decrease in the Subcontract price resulting from changes shall be agreed upon in writing by the parties hereto. Any claim for adjustment of the subcontract price under this Section must be made in writing within ten days from the date such changes are ordered. The Subcontract price shall be equitably adjusted on account of any such changes, subject to any applicable provisions of the contract between the Contractor and the Owner....
Subcontractor's Inability to Complete Subcontracted Work
Section 5 of the Vernco Contract addresses Vernco's prosecution of work:
Section 5. PROSECUTION OF WORK.
...
(b) In the event the Subcontractor fails to comply, or becomes disabled and is unable to comply with the provisions of this Subcontract as to character or time of performance, and the failure or inability is not corrected within five days after written request by the Contractor to the Subcontractor, the Contractor may, by other Subcontractor or otherwise, without prejudice to any other right or remedy, take over and complete the performance of this Subcontract at the expense of the Subcontractor, or, without taking over the work, may furnish *732 the necessary materials and/or employ the workmen necessary to remedy the situation at the expense of the Subcontractor. If the Contractor takes over the work pursuant to this paragraph it is specifically agreed that the Contractor may take possession of the premises and of all materials the Subcontractor at the site for the purpose of completing the work covered by this Subcontract....
Insurance Coverage
Section 10 of the Vernco Subcontract outlines insurance requirements for the Applewhite Project:
Section 10. INSURANCE. (a) The Subcontractor shall provide and maintain Workman's Compensation and Employer's Liability Insurance for the protection of his employees, as required by law of an employer or to limits specified in the contract. The Subcontractor shall also provide and maintain full force and effect, during the term of this Subcontract, insurance (including but not limited to insurance covering the operation of automobiles, trucks and other vehicles) with an insurance company satisfactory to the Contractor protecting the Subcontractor, the Owner and the Contractor against liability from damages ... arising from and growing out of the Subcontractor's operations in connection with the performance of this Subcontract.
(b) [...] Written proof satisfactory to the Contractor and the Owner of compliance with the requirements of this section shall be furnished to the Contractor and the Owner before any work is performed under this Subcontract. Such proof of insurance shall provide for ten (10) days written notice to the Contractor and the Owner prior to the cancellation or modification of any insurance referred to therein.
Breach
Finally, Section 31 deals with what happens in the event of a breach:
Section 31. BREACH OF TERM OR CONDITION. Upon Subcontractor's breach of any term or condition of this Subcontract, except those which specifically provide a period within which a particular breach may be cured, the Contractor, in his sole discretion, may immediately declare this Subcontract terminated, and shall be entitled to all the rights and remedies provided by this Subcontract and by law. The waiver by Contractor of any particular breach shall in no way affect Contractor's right to terminated [sic] this Subcontract on any subsequent breach.
Vernco Defaults on Obligations to Suppliers; Nelson and Claftin Become Personal Guarantors of the Vernco Subcontract
On June 16, 2004, Hood issued Vernco its first check for work on the Applewhite Project. On July 15, 2004, Hood issued Vernco a second check. The combined value of both those checks was more than $950,000. Vernco was obligated to pay its suppliers from that sum of money; however, the evidence is undisputed that Vernco failed to do so, at least in part. One supplier, National Waterworks, made a claim against Vernco with Hood and threatened to file liens against the project, alleging that Vernco failed to pay an invoice. According to Hood, the outstanding claim could have led Hood to lose the Prime Contract entirely. As such, on August 11, 2004, Hood executed a letter agreement with Vernco (the Letter Agreement) and personal guaranty agreements with Claflin and Nelson (the Guaranty Agreements) to rectify the problem. The Letter Agreement stated as follows:
*733 1. Vernco stipulates[,] acknowledges[,] and agrees that it has received from Hood, pursuant to the Contract[,] the sum of $950,663.96.
2. From the sum of $950,663.96 Vernco was obligated to pay all suppliers in connection with the Contract. [...]
3. Although paid by Hood, Vernco failed to pay the suppliers the sum of $583,440.73 through June 30, 2004.
4. National Waterworks Inc. of Waco, Texas has submitted a claim against Hood. [...]
5. Vernco is therefore in breach of the Contract and has requested Hood to settle the debt and obligation owed in the following manner:
a. Vernco will furnish no less than three crews averaging 4-6 people on the job evidenced by the Contract until such job is completed to the full satisfaction of Hood and all suppliers of Vernco are paid in full. Hood has no obligation to accept the crews and all work performed shall be subject to the approval by Hood.
b. All future checks to Vernco pursuant to the Contract shall be joint checks issued to Vernco and its suppliers.
c. Hood is authorized, at its election, to direct or make any payment owed Vernco under any other contract to suppliers under the Contract.
d. David Nelson and Jack Claflin will execute an affidavit, at Hood's request, identifying all suppliers and amounts owed as of August, 1, 2004, and further an affidavit upon completion of Contract identifying all suppliers and that all suppliers have been paid in full.
e. David Nelson and Jack Claflin individually do hereby, jointly and severally, agree to fully indemnify, protect, and hold harmless Hood it's [sic] officers and directors from and against any and all claims, demands, costs, liabilities, or other expenses of any kind or nature arising from or out of the Contract.... David Nelson and Jack Claflin agree to provide additional security or collateral, at the request of Hood, sufficient to secure the obligations of Vernco under the Contract or this Agreement.
f. David Nelson and Jack Claflin agree to assume any and all liabilities and obligations owed by Vernco to Hood; including but not limited to all obligations by Vernco to pay its suppliers and to protect Hood from any and all claims associated therewith and to execute the Guarantee Agreements attached hereto....
Work Stalls As Scope of Applewhite Project Expands; TxDOT Issues Change Order 17
In summer 2004, the parties realized that the Applewhite Project would need sewer pipes larger than those originally contemplated in the Prime Contract. Horizontal drilling work on the Applewhite Project stopped for several months as prime contractor Hood and TxDOT attempted to reach a mutually agreeable price point for the sewer pipe change order and scope of work. Negotiations ultimately stalled, leading TxDOT to invoke the force account provisions[2] of the Prime *734 Contract. Using the price schedule set out in the Blue Book for work performed on a force account basis, TxDOT issued Change Order 17, which made certain alterations to the scope of work on the Prime Subcontract. The change order allowed for certain force account markups (FAMs) to be paid.
After Change Order 17 was issued, Hood met with its subcontractors, including Vernco, to discuss the changes, including the allocation of FAMs among the subcontractors. What happened at that meeting is disputed. No written agreement as to how the FAMs would be split appears in the record. It is undisputed that Vernco never formally requested an equitable adjustment in price in writing under the procedure set out in Subcontract Section 4. Nevertheless, the parties all agree that Hood promised to give Vernco the 55 percent labor burden, and Vernco actually received that FAM payment in a two-party check. Beyond that, the record is conflicting.
At trial, Claflin and Nelson both claimed to have been on the phone during the part of the meeting dealing with the FAMs. However, Claflin testified that Nelson later told him that in addition to the 55 percent labor burden markup, Hood would also pay Vernco 20 percent on labor, 10 percent on materials, and 20 percent on equipment. Nelson agreed that he understood that Hood would pay those specific percentages on markups, but also claimed at trial that it was Claflin who had told him Hood would pay those percentages, and not the other way around. Ranney Hood and Randy Hood both insisted that they initially told all subcontractors that they would only receive the 55 percent labor burden; however, Ranney Hood testified that Hood eventually gave a 10 percent materials markup to the other subcontractors and not Vernco.
Hood Terminates the Vernco Contract, Then Hires David Nelson's Company to Finish Work on the Applewhite Project
After the discussion regarding Change Order 17, Vernco continued its work on the Applewhite Project. In January 2005, Vernco received a check for $50,000.00, which represented the first profits Vernco was entitled to keep for itself in full. Vernco was scheduled to make a $14,515 insurance premium payment to Insurance One in early January 2005. The evidence is undisputed that Vernco failed to make this payment. Vernco maintains on appeal that due to the lack of FAM payments and the four percent retainage that Hood kept on every payment, Vernco could not pay its bills, including the insurance premium, out *735 of the $50,000 check. Vernco's insurance coverage had lapsed once before, but Vernco was able to reinstate coverage.
A week before Nelson received notice that Vernco's insurance coverage had lapsed and Hood terminated the Vernco Subcontract, Nelson began asking agent Gerald Koenning about obtaining insurance coverage for his personal construction company, Collective Contracting. Koenning was also the insurance agent for Vernco. At that point in time, Collective Contracting had no cash on hand. The only asset in its possession was a pickup truck.
On January 28, 2005, Nelson learned that Vernco's insurance coverage had lapsed because Vernco failed to pay the outstanding premium. Nelson informed Hood that Vernco employees could not report to work that day because Vernco's liability insurance had lapsed for non-payment and it was a safety issue. Nelson did not first tell Claflin about the lapse in insurance coverage before calling Hood. While Nelson did tell Hood about the lapse in insurance coverage, Nelson did not tell anyone else on Vernco's other jobs.
Ranney Hood told Nelson to have Koenning call Hood to discuss the insurance situation. Based on Vernco's failure to maintain liability insurance, Hood called Claflin in and terminated the Vernco Subcontract. That same day, Hood hired Nelson's own personal construction company, Collective Contracting, Inc. (CCI), to perform the remainder of the work on the water utility subcontract.
At the time Nelson began working on the Applewhite Project, Collective Contracting was not a TxDOT-approved subcontractor, nor did it have insurance coverage. Hood advanced Collective Contracting $14,438.29 so that it could procure insurance. Hood's accounts payable bookkeeper testified that Hood's advancement of money to a subcontractor in that fashion was unusual. Collective Contracting was also subject to a smaller retainage percentage in the payments it received from Hood as compared to Vernco. Vernco alleges that by contracting with Collective Contracting as a separate entity instead of hiring Nelson in-house directly, Vernco was also able to claim an extra five percent FAM for itself for employing a subcontractor. By the time the Applewhite Project was completed, Collective Contracting was able to purchase new equipment and had other contracts with Hood.
B.
Procedural History
Vernco Sues; Hood and Nelson Question Vernco's Standing
Vernco reached an agreement effective September 1, 2006,[3] with one of its creditors, Jefferson State Bank (the Bank), to stave off foreclosure of certain liens against the company (the Forbearance Agreement). As part of the Forbearance Agreement, Vernco and Claflin as Vernco's guarantor acknowledged that the Bank had a security interest in various Vernco assets, that it had taken "ownership, possession, custody and control of the Company's receivables and proceeds therefrom" with the consent of both Claflin and Vernco, and that:
One of the receivables that Lender now owns is a claim against E.E. Hood & Sons, Inc., David Nelson and other parties ... styled and numbered as 'Vernco Construction, Inc. v. David Nelson, et al.'; Cause No. 2006-CI-18807 and *736 pending in the 225th Judicial District Court of Bexar County, Texas ('the Litigation'). The Company and the Guarantor have requested that, in consideration for the Company's and Guarantor's assistance to Lender in collecting the sums that are subject to the Litigation, they be compensated for such assistance in the event of a recovery and upon the terms and conditions set forth herein.
In a section of the Forbearance Agreement detailing various acknowledgement, Vernco, Claflin, and the Bank make the following acknowledgment about the Bank's security interests:
3. Acknowledgment of Security Interests. The Company and the Guarantor jointly and severally acknowledge the validity and enforceability of the security interests granted in favor of the Lender pursuant to the security agreements.... The Company and Guarantor jointly and severally acknowledge that Lender, pursuant to applicable law, is the owner of all of the Company's receivables (and proceeds therefrom), including, but not limited to, the receivables and claims (including the commercial tort claims) identified in the Litigation. However, the Company and Gaurantor acknowledge that Lender has not accepted and taken ownership of such receivables and claims in full satisfaction of its claims against the Company and Guarantor, the remaining balance of such claims being set forth above.
After the effective date of the Forbearance Agreement with the Bank, Vernco sued Hood, Nelson, and Collective Contracting. Hood and Nelson filed a pretrial motion to dismiss for want of jurisdiction, asserting that Vernco lacked standing to prosecute the case because it had assigned all its interests to the Bank under the Forbearance Agreement. In response, Vernco submitted a copy of an addendum to the Forbearance Agreement that it and the Bank had executed after the motion to dismiss was filed (the Addendum) purportedly clarifying that Vernco was acting in accordance with the Bank's wishes. The trial court denied the motion to dismiss, and the case proceeded to trial. Hood and Nelson renewed their challenges to jurisdiction several times during trial. The trial court declined to rule on those challenges or otherwise dismiss the case.
At Trial
Vernco ultimately proceeded to trial on several causes of action: (1) breach of contract by Hood; (2) breach of fiduciary duty by Nelson, with Hood being implicated as a party to the breach through knowing participation; (3) tortious interference with a contract by Nelson; (4) fraud and conspiracy to defraud by both Hood and Nelson.
Jury Charge and Verdict
Breach of Contract
The jury charge's Question 1 asked: "Did Hood fail to comply with the Applewhite Subcontract[4] prior to January 21, 2005 by failing to pay Vernco markups for labor, equipment, and/or materials pursuant to the Applewhite Subcontract?" The jury responded "yes." Question 2 asked: "What amounts of money, if any, if paid now in cash, would fairly and reasonably compensate Vernco for its damages, if any, proximately caused by Hood's breach of the Applewhite Subcontract?" The question instructed the jury to consider only:
*737 (1) lost profits, if any, on the non-force account work; (2) lost profits, if any, on the force account work; (3) loss of Vernco's value, if any, as a business. The jury returned a verdict in the following amounts:
• $1,191,758.00 in lost profits on non-force account work
• $2,122,978.00 in lost profits on force account work
• $511,000.00 in loss of Vernco's value as a business.
The jury also awarded attorney's fees of $800,000.00, plus $30,000.00 in contingent attorney's fees if Hood appealed (Question 3).[5]
Tortious Interference with a Contract
The jury also found that Nelson intentionally interfered with the Vernco Subcontract (Question 8), that Nelson did not have a good faith belief he had the right to do so (Question 9), and that he was 75 percent responsible for tortious interference damages (Question 12). Koenning and Insurance One were deemed to have also interfered in the Vernco Subcontract (Question 10) and were 25 percent responsible for tortious interference damages (Question 12).[6] Question 11 asked what amount of money would compensate Vernco for such interference. The question instructed the jury to consider only (1) lost profits, if any, on the non-force account work; (2) lost profits, if any, on the force account work; (3) loss of Vernco's value, if any, as a business. The jury returned a verdict in the following amounts:
• $1,191,758.00 in lost profits on non-force account work
• $2,122,978.00 in lost profits on force account work
• $511,000.00 in loss of Vernco's value as a business.
Breach of Fiduciary Duty
Question 14 set out the question of fiduciary duty as follows:
Did Nelson comply with his fiduciary duty to Vernco?
Nelson owed Vernco a fiduciary duty relating to the performance of his role at Vernco as Vernco's employee in charge of Vernco's water utilities work on the Pat Booker and Applewhite projects. To prove he complied with his duty, Nelson must show all of the following:
• the conduct in question was fair and equitable to Vernco;
• Nelson made reasonable use of the confidence that Vernco placed in him;
• Nelson acted in the utmost good faith and exercised the most scrupulous honesty toward Vernco;
• Nelson placed the interest of Vernco before his own;
• Nelson did not use the advantage of his position to gain any benefit for himself at the expense of Vernco;
• Nelson did not place himself in any position where his self-interest might *738 conflict with his obligations as a fiduciary; and
• Nelson fully and fairly disclosed all important information to Vernco concerning the conduct in question.
The jury answered "no" and found that Nelson acted with malice (Questions 14 and 16). The jury also found that Hood knowingly participated in Nelson's breach of his fiduciary duty to Vernco (Question 17) and acted with malice as well (Question 18).
Question 15 asked what amount of money would compensate Vernco for such interference. The question instructed the jury to consider (1) lost profits, if any, on the non-force account work; (2) lost profits, if any, on the force account work; (3) loss of Vernco's value, if any, as a business. The jury returned a verdict in the following amounts:
• $1,191,758.00 in lost profits on non-force account work
• $2,122,978.00 in lost profits on force account work
• $511,000.00 in loss of Vernco's value as a business
• $350,000.00 from the failure to pursue inefficiency claims.
Fraud
On Vernco's fraud claim, the jury found that both Hood and Nelson committed fraud against Vernco but that Koenning and Insurance One did not commit fraud (Question 19). In Question 21, the jury found Hood and Nelson each 50 percent liable for damages (Question 21). In Question 20, the jury was asked what amount of money would reasonably compensate Vernco for damages caused by fraud. The question instructed the jury to consider only (1) lost profits, if any, on the non-force account work; (2) lost profits, if any, on the force account work; (3) loss of Vernco's value, if any, as a business. The jury returned a verdict in the following amounts:
• $1,191,758.00 in lost profits on non-force account work
• $2,122,978.00 in lost profits on force account work
• $511,000.00 in loss of Vernco's value as a business.
Related to the fraud findings in Question 19, the jury found that both Hood and Nelson acted with malice (Question 22).
Civil Conspiracy
Question 23 was contingent on jury answers of either "no" to Question 14 (i.e. finding that Nelson did not comply with his fiduciary duty) or "yes" to Question 19 (i.e. one or more defendants committed fraud). Question 23 asked:
Were two or more of those listed below part of a conspiracy that damaged Vernco?
To be part of a conspiracy, a defendant and another person or persons must have had knowledge of, agreed to, and intended a common objective or course of action that resulted in the damages to Vernco. One or more persons involved in the conspiracy must have performed some act or acts to further the conspiracy.
Answer 'Yes' or 'No' as to each of the following:
Hood ANSWER: Yes Nelson ANSWER: Yes Koenning/Insurance Once ANSWER: Yes
*739 Punitive Damages
Questions 24 and 25 related to the jury's malice findings as to the breach of fiduciary duty and fraud claims. The instruction asked the jury to assess exemplary damages-"an amount that you may in your discretion award as a penalty or by way of punishment." The jury assessed $150,000.00 in punitive damages against Hood (Question 24) and $150,000.00 against Nelson (Question 25).
The jury's final verdict is represented in visual form below in Table 1.1.
JURY'S FINAL VERDICT BREACH OF TORTIOUS BREACH OF FRAUD CONTRACT INTERFERENCE FIDUCIARY WITH A DUTY CONTRACT Hood Liable? ? n/a ? (knowing ? (co-conspirator) participation Nelson Liable? n/a ? ? ? (co-conspirator) Joint/Several NO NO YES YES Liability? DAMAGES Lost Profits (Non-Force $1,191,758.00 $1,191,758.00 $1,191,758.00 $1,191,758.00 Account) Lost Profits (Force $2,122,978.00 $2,122,978.00 $2,122,978.00 $2,122,978.00 Account) Lost Business Value $511,000.00 $511,000.00 $511,000.00 $511,000.00 Failure to Pursue Pat Booker Inefficiency ---- ---- $350,000.00 ---- Claims Attorney's Fees $800,000.00[7] n/a n/a n/a Punitive Damages • $150,000.00 against Hood ---- ---- • $150,000.00 against Nelson FINAL TOTAL Hood Individually $3,825,736.00 n/a in damages + $150,000 in punitive damages $800,000 in attorney's fees Nelson Individually n/a $2,869,302.00 $150,000 in punitive damages in damages (75% responsibility) Hood & Nelson, n/a n/a $4,175,736.00 $3,825,736.00 Jointly/Severally in damages in damages Table 1.1
[Editor's Note : The preceding image contains the reference for footnote[7] ].
Judgment
Litigation between the parties continued following the verdict, but prior to the entry of judgment. The trial court entered its final judgment on April 7, 2010. In the recitals section[8] of the judgment, *740 the trial court took notice of the jury's verdict, finding that Vernco prevailed on all its causes of action and that all the jury's findings as to liability and damages were legally sufficient. However, the trial court noted that "[w]hile Vernco is entitled to the greatest recovery possible, Vernco cannot have a double recovery of damages."[9]
Recognizing this, in the decretal clauses of the judgment, the trial court ordered that Vernco, in its action for breach of contract, "shall have and recover from Defendant Hood" actual damages ($3,825,736.00); prejudgment interest at a rate of 6 percent ($918,176.64); daily interest at a rate of $628.88 per day starting on January 30, 2010 through the date of entry of the final judgment; attorney's fees for trial work ($800,000.00); and conditional attorney's fees in the event Hood appealed ($30,000.00).
The trial court further ordered that, with respect to the breach of fiduciary duty claim, Vernco "shall have and recover jointly and severally from Defendants Hood and Nelson" actual damages ($350,000.00); prejudgment interest ($70,000.00); and daily interest at a rate of $47.95 a day starting on January 30, 2010 through the date of entry of the final judgment. The trial court also ordered that Hood and Nelson were jointly and severally liable for court costs.
With respect to punitive damages, the trial court ordered that Vernco recover $150,000.00 in punitive damages individually against Nelson and $150,000.00 in punitive damages individually against Hood.
The trial court ordered that Vernco take nothing against Collective Contracting.
Finally, the trial court also ordered post-judgment interest to accrue at a rate of 5 percent per annum.
The judgment's final paragraph states: "This Final Judgment is intended to be a full, final, and appealable judgment, disposing of all parties, claims, and causes of action in this cause; all relief not expressly awarded by this judgment is hereby, in all things, DENIED." The judgment was signed April 7, 2010.
Notably, while the trial court made recitals in the judgment preamble that Vernco prevailed on its causes of action for tortious interference with a contract and fraud/conspiracy to defraud against Hood and Nelson and that the law and the jury's findings support joint and several recovery on those claims, after the trial court's paragraph noting that double recovery was impermissible, the judgment decretal paragraphs contain nothing ordering Vernco to recover on its claims for tortious interference with a contract or fraud/conspiracy to defraud. Reading the judgment as a whole, particularly in light of its concerns about double recovery, we take the exclusion of the tortious interference and fraud/conspiracy to defraud causes of action from the judgment to be an intentional effort by the trial court to avoid granting a double *741 recovery of damages, and not simply a clerical error amenable to correct via a judgment nunc pro tunc. We deal with the effect of these omissions later in the opinion.
The final breakdown of the trial court's judgment as we understand it from the judgment's decretal clauses is set out below visually in Table 1.2 below.
TRIAL COURT'S FINAL JUDGMENT FROM HOOD INDIVIDUALLY FROM NELSON INDIVIDUALLY For breach of contract: For punitive damages re: breach of • $3,825,736.00 in actual damages [lost fiduciary duty: profits/business value] • $918,176.64 in prejudgment interest (6%) • $150,000 (punitive damages) • $800,000 in attorney's fees • $30,000 in conditional attorney's fees on appeal For punitive damages re: breach of fiduciary duty: FROM COLLECTIVE CONTRACTING, INC. • $150,000 • Take Nothing ($0) TOTAL: • $4,743,912.64 (damages/interest) • $830,000.00 (attorney's fees) JOINT AND SEVERAL LIABILITY (From Either Hood or Nelson) For breach of fiduciary duty: • $350,000.00 in actual damages [i.e., lost inefficiency claims] • $70,000.00 in prejudgment interest • $47.95/day from 1/30/10 to the date of entry of final judgment Other: Costs of court RECOVERY NOT PERMITTED FROM EITHER PARTY For tortious interference For breach of fiduciary duty: For fraud: with a contract: • No relief granted for actual • No relief granted • No relief granted damages (i.e. $3,825,736 in lost profits jointly/severally against Hood & Nelson) Table 1.2
Post-Judgment Proceedings
Following rendition of judgment, Hood and Nelson appealed. That appeal was transferred from the Fourth Court of Appeals to this Court by order of the Supreme Court of Texas.
On initial appeal, we vacated the trial court's judgment and dismissed for want of subject matter jurisdiction. Nelson v. Vernco Const., Inc. , 406 S.W.3d 374, 380 (Tex.App.-El Paso 2013, pet. granted). We found that Vernco lacked standing to bring the lawsuit ab initio because Vernco lost any justiciable interest in the controversy when, prior to suit, the company assigned all of its interests in the litigation *742 to the Bank in the Forbearance Agreement. Id. While we held that there would have been subject-matter jurisdiction had Vernco shown it filed suit on the Bank's behalf with prior authorization, we declined to consider the Addendum that purported to authorize Vernco to file suit on the Bank's behalf in our analysis: "As Vernco did not make an offer of proof of the supplement to the trial court and the supplement was not admitted into evidence but is merely appended to Vernco's brief, it was not before the trial court and is not before this Court." Id.
The Texas Supreme Court reversed, holding that we had erroneously concluded the Addendum was not part of the appellate record. Vernco Const., Inc. v. Nelson , 460 S.W.3d 145, 150 (Tex. 2015). Without ultimately deciding the jurisdictional issue, the high court held that "[c]ontrary to the court of appeals' suggestion otherwise, we are not limited to reviewing evidence provided in an offer of proof at the trial on the merits" because the dispositive ruling hearing here was made pretrial. Id. at 150. Thus, a proper jurisdictional review would include pleadings related to the pretrial motion to dismiss hearing, and "[b]oth the forbearance agreement and the addendum are included with the pleadings germane to the motion to dismiss[.]" Id. The Supreme Court observed that while the trial court had apparently held an evidentiary hearing related to the standing issue, no reporter's record appeared in the appellate record, nor did the parties explain the absence of the reporter's record or what effect it had, if any, on the jurisdictional analysis. Id. at 151. The Court went on to hold that "[c]learly, however, the addendum is part of the clerk's record before the trial court and certainly must be considered if the matter was determined on the pleadings." Id. "Because the court of appeals did not consider evidence in the relevant portion of the appellate record," the Court reversed our judgment and remanded the case for further proceedings, "including reconsideration of the standing issue." Id.
We hear this case on remand from the Supreme Court of Texas.
II.
DISCUSSION
Although this case deals primarily with the interpretation of a contract numbering only a few pages, the trial record in this case is extensive,[10] as is the briefing presented by both appellants. Together, Hood and Nelson collectively raise twenty-five issues on appeal-Hood advances twelve issues and Nelson thirteen.[11] Many of these appellate points also embrace clusters of multiple subpoints.[12] Not all points *743 and subpoints raised in the Issues Presented section of the brief match neatly with the headings or substantive arguments raised in the text of the briefs themselves.
"A point of error addressing more than one specific ground of error is multifarious." Shull v. United Parcel Serv. , 4 S.W.3d 46, 51 (Tex.App.-San Antonio 1999, pet. denied). "If a court concludes that a point of error is multifarious, it may refuse to review it or it may consider the point of error if it can determine, with reasonable certainty, the error about which complaint is made." Id. As explained in further detail below, several of the points in Hood's Opening Brief are multifarious.
Per TEX.R.APP.P. 38.1(h), when appellants present a list of extremely long, multifarious issues on appeal that do not match up with arguments raised in the body of the brief so that "we cannot tell which arguments and authorities sections in the brief address which issues," we need only address those issues actually raised in the body of the appellant's brief. Columbia Med. Ctr. of Las Colinas v. Bush ex rel. Bush , 122 S.W.3d 835, 841 n.1 (Tex.App.-Fort Worth 2003, pet. denied). As for those particular points that have been adequately briefed, we will endeavor to address all such points necessary to the resolution of this appeal. TEX.R.APP.P. 47.1. Bearing these briefing rules in mind, we proceed.
We deal with the parties' joint jurisdictional argument first before addressing each party's legal sufficiency, jury charge, and evidentiary error complaints, grouped by cause of action where appropriate.
A.
JURISDICTION
(Hood Issue One/Nelson Issue One)
We begin with jurisdiction. In Issue One of both Appellants' briefs, Hood and Nelson assert that we should vacate the trial court's judgment because as a result of the Forbearance Agreement, only the Bank had standing to prosecute this claim, not Vernco. Per Appellants' argument, since Vernco bargained its right to recover damages from Hood and Nelson away to the Bank in order to stave off foreclosure, Vernco had no legal authority to institute suit in the first place, rendering all actions in this case void ab initio for want of jurisdiction.
We disagree.
Standard of Review
We review subject-matter jurisdiction de novo. Estate of Matthews, III , 510 S.W.3d 106, 113 (Tex.App.-San Antonio 2016, pet. denied). Standing is an essential component of subject-matter jurisdiction. Id. "The issue of standing focuses on whether a party has a sufficient relationship with the lawsuit so as to have a justiciable interest in its outcome."
*744 Fitness Evolution, L.P. v. Headhunter Fitness, L.L.C. , No. 05-13-00506-CV, 2015 WL 6750047, at *13 (Tex.App.-Dallas Nov. 4, 2015, no pet.) (mem. op. on reh'g). Under Texas law, the standing inquiry requires examination of the following:
(1) the plaintiff must be personally injured-he must plead facts demonstrating that he (rather than a third party) suffered the injury-and the injury must be concrete and particularized, actual or imminent, not hypothetical;
(2) the plaintiff's alleged injury is fairly traceable to the defendant's conduct; and
(3) the plaintiff's alleged injury is likely to be redressed by each form of requested relief.
Id. ; see also Heckman v. Williamson Cty. , 369 S.W.3d 137, 155 (Tex. 2012).
The first element-injury-focuses in on whether the plaintiff "plead[ed] facts demonstrating that he, himself (rather than a third party or the public at large), suffered the injury." Heckman , 369 S.W.3d at 155. "A plaintiff has standing when it is personally aggrieved, regardless of whether it is acting with legal authority[.]" [Emphasis and internal citation omitted]. Austin Nursing Ctr., Inc. v. Lovato , 171 S.W.3d 845, 848-49 (Tex. 2005). "In order to establish standing to maintain a breach of contract action, a plaintiff must show either third-party beneficiary status or privity." OAIC Commercial Assets, L.L.C. v. Stonegate Village, L.P. , 234 S.W.3d 726, 738 (Tex.App.-Dallas 2007, pet. denied). "For purposes of standing, privity is established by proving that the defendant was a party to an enforceable contract with either the plaintiff or a party who assigned its cause of action to the plaintiff." [Internal quotations and alterations omitted]. Id. ; see also Republic Petroleum, L.L.C. v. Dynamic Offshore Res. NS, L.L.C. , 474 S.W.3d 424, 430 (Tex.App.-Houston [1st Dist.] 2015, pet. denied) ("A plaintiff establishes standing to maintain a breach-of-contract action by demonstrating that it has an enforceable interest as a party to the contract, as an assignee of a party, or as a third party beneficiary.").
The second element-traceability-recognizes that the "court [can] act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." [Internal quotations and citation omitted]. Heckman , 369 S.W.3d at 155.
Finally, the third element-redressability-delineates the plaintiff's burden to "establish a substantial likelihood that the requested relief will remedy the alleged injury in fact." [Internal quotations and citations omitted]. Id. at 155-56. "If, for example, a plaintiff suing in a Texas court requests injunctive relief as well as damages, but the injunction could not possibly remedy his situation, then he lacks standing to bring that claim." Id. at 155. The redressability element largely reflects the trial court's inability to render advisory opinions. Under element three, "the trial court's decision must be able to bind the parties[;]" if the trial court's decision would simply result in an advisory opinion, there is no live controversy and no subject-matter jurisdiction. Estate of Matthews, III , 510 S.W.3d at 116.
Scope of Review
The Texas Supreme Court has made clear that in this case, the scope of our review includes evidence submitted at the pretrial hearing related to the jurisdictional motion, since that was the evidence before the trial court when it rendered its decision. Vernco Constr., Inc. , 460 S.W.3d at 150. With respect to pretrial hearings, *745 "[i]f all the evidence is filed with the clerk and only arguments by counsel are presented in open court, the appeal should be decided on the clerk's record alone." Michiana Easy Livin' Country, Inc. v. Holten , 168 S.W.3d 777, 782 (Tex. 2005). We presume pretrial hearings "are nonevidentiary absent a specific indication or assertion to the contrary." Id. at 783. "If the proceeding's nature, the trial court's order, the party's briefs, or other indications show that an evidentiary hearing took place in open court, then a complaining party must present a record of that hearing to establish harmful error." Id. "When there is no reporter's record" when a reporter's record is necessary to establish evidence, "we must presume that sufficient evidence was introduced to support both the trial court's express findings and any omitted findings necessary to support the order." Big Bend Commc'ns, Inc. v. Meille , No. 08-03-00201-CV, 2003 WL 22023658, at *2 (Tex.App.-El Paso Aug. 28, 2003, no pet.) (mem. op.).
Although the Texas Supreme Court speculated that there may have been evidence presented at the pretrial jurisdictional hearing, the Court also seemed to indicate that "the trial court's docket sheet suggests that the hearing transcript was not omitted from the appellate record, but simply does not exist." Vernco Constr., Inc. , 460 S.W.3d at 151 n.4. We will not belabor the effect of this phantom reporter's record, as its presence or absence is not dispositive. Regardless of whether this issue is decided on the pleadings or as a result of reporter's record default presumption that sufficient facts exists to support the trial court's ruling, we determine that subject-matter jurisdiction existed in the trial court.
Analysis
As stated previously, this is not the first time we have considered the jurisdictional issue. Having received clarity from the Texas Supreme Court that the Addendum is, in fact, part of the record before this Court, we address subject-matter jurisdiction in light of the Addendum.
First, though, we must note that while the Addendum controversy dominated our previous discussion of jurisdiction, there is an unaddressed problem looming in the background of this issue. Although both we and the parties treated this question as a standing issue in the initial appeal, on closer review, it appears that Hood and Nelson's arguments regarding Vernco's authority to prosecute this lawsuit go not to the jurisdictional issue of standing, but the procedural issue of capacity.
"Texas courts have had considerable difficulty in defining the relationship between the similar, but distinct, doctrines of capacity and standing." Fitness Evolution, 2015 WL 6750047, at *12. "A plaintiff has standing when it is personally aggrieved, regardless of whether it is acting with legal authority; a party has capacity when it has the legal authority to act, regardless of whether it has a justiciable interest in the controversy." [Emphasis in original, internal citation omitted]. Austin Nursing Ctr., Inc. , 171 S.W.3d at 848-49. While standing is a jurisdictional issue, capacity is an affirmative defense. Estate of Matthews, III , 510 S.W.3d at 113 ; John C. Flood of DC, Inc. v. SuperMedia, L.L.C. , 408 S.W.3d 645, 653 (Tex.App.-Dallas 2013, pet. denied). Consequently, "[u]nlike standing, an argument that an opposing party does not have the capacity to participate in a suit can be waived" by failing to raise the issue in a verified pleading under TEX.R.CIV.P. 93(1). [Internal citation omitted]. See Estate of Matthews, III , 510 S.W.3d at 113.
Appellants' arguments bleed the concepts of standing and capacity together. Their chief argument seems to be *746 that Vernco did not have the Bank's authority to litigate on the Bank's behalf. That sounds to us like a capacity issue that has been improperly recast as a standing issue. "Capacity is a party's legal authority to go into court to prosecute or defend a suit." Fitness Evolution , 2015 WL 6750047, at *14. "While the question of whether a party is entitled to sue on a contract is often informally referred to as a question of 'standing,' it is not truly a standing issue because it does not affect jurisdiction." Fitness Evolution , 2015 WL 6750047, at *14. Instead, that question is more properly conceptualized as a capacity issue. Id.
Take for example Republic Petroleum, L.L.C. , 474 S.W.3d at 430, decided after this case came back down from the Texas Supreme Court on remand. In Republic Petroleum , Republic and Dynamic Offshore entered into an oil-and-gas lease. Republic ultimately assigned its working interest in the lease to a third party. Thereafter, Republic sued Dynamic Offshore for breach of contract. Id. at 428. Dynamic Offshore challenged Republic's standing, maintaining that Republic's assignment of its contractual rights to a third party defeated subject-matter jurisdiction. The Houston First Court of Appeals disagreed.
The Court began its analysis by stating that "[a] plaintiff establishes standing to maintain a breach-of-contract action by demonstrating that it has an enforceable interest as a party to the contract, as an assignee of a party, or as a third party beneficiary." Id. at 430. The Court further observed that an assignor's obligations under a contract generally survive assignment, and that conversely, "a party who assigns its interest under a contract has standing to sue for damages that it incurred based on the rights it had prior to the assignment, unless the breaching party's actions caused no damage to the assignor or the assignor right's under the agreement were terminated or otherwise released; liability for the non-assigning party's breach of its obligations do not disappear upon assignment, but remain in place." Id. Dynamic Offshore could not defeat subject-matter jurisdiction and erase any liability for breach of contract by arguing that Republic has assigned its contractual rights to a third party; instead, the true (and waivable) issue was whether Republic had the capacity to bring suit as the assignee's representative. Id. at 431.
Republic Petroleum establishes that both the original contracting party and the assignee would have standing to bring a breach of contract suit against the defendant. Consequently here, Vernco as original contracting party had standing to sue Hood and Nelson because those parties were in privity and Vernco suffered the alleged injury. Vernco's assignment of its claims to the Bank as part of the Foreclosure Agreement also gave the Bank potential standing to bring the claim as well, since the Bank thereby obtained a property interest in the claim. However, the separate issue of whether Vernco had the actual authority to bring suit on the Bank's behalf in light of the agreement's scope and what was actually transferred is a capacity issue that was waived by Hood and Nelson's failure to file a timely verified objection on that ground as required by TEX.R.CIV.P. 93(1).[13]
*747 In summary, even though it contractually assigned an interest in the claim to a third party, Vernco had standing as the original injured party to sue on this claim. Our inquiry is complete, and we confirm subject-matter jurisdiction.
Both Hood's and Nelson's Issue One is overruled.
B.
LIABILITY FINDINGS :
SUFFICIENCY/CHARGE ERROR POINTS BY CAUSE OF ACTION
Having determined that the trial court had jurisdiction to consider this dispute, we next turn to the merits points dealing with various legal and factual sufficiency challenges and alleged jury charge errors. We set out the applicable standards of review before addressing each of Appellants' claims individually.
Standards of Review
For Legal and Factual Sufficiency
We sustain a legal sufficiency challenge when the judgment is unsupportable as a matter of law because (1) there is "a complete absence of evidence of a vital fact," (2) "the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact," (3) there is "no more than a mere scintilla" of evidence proving a vital fact, or (4) the evidence conclusively establishes the opposite proposition of a proffered vital fact. City of Keller v. Wilson , 168 S.W.3d 802, 810 (Tex. 2005). We view evidence in the light most favorable to the ruling on a legal sufficiency challenge, indulging "every reasonable inference" in the trial court's favor. El Paso Indep. Sch. Dist. v. Pabon , 214 S.W.3d 37, 41 (Tex.App.-El Paso 2006, no pet.). "Any evidence of probative force supporting a finding requires us to uphold" the trial court's ruling. ACS Invs., Inc. v. McLaughlin , 943 S.W.2d 426, 430 (Tex. 1997). "Where an outcome-determinative interpretation of evidence falls within the zone of reasonable disagreement, we are without jurisdiction to disturb the verdict or decision for legal sufficiency." Clayton Williams Energy, Inc. v. BMT O & G TX, L.P. , 473 S.W.3d 341, 349 (Tex.App.-El Paso 2015, pet. denied). "When a legal sufficiency point is sustained, it is our duty to reverse and render." Heritage Res., Inc. v. Hill , 104 S.W.3d 612, 619 (Tex.App.-El Paso 2003, no pet.).
"In a factual sufficiency challenge, the court of appeals must consider and weigh all of the evidence, and can set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." [Internal quotation marks omitted]. Samuels v. Nasir , 445 S.W.3d 886, 891 (Tex.App.-El Paso 2014, no pet.). When we sustain a factual sufficiency challenge, the proper remedy is reversal and remand to the trial court for a new trial. Hill, 104 S.W.3d at 619.
*748 For Jury Charge Errors
"We review a trial court's decision to submit or refuse a particular instruction under an abuse of discretion standard of review." In re V.L.K. , 24 S.W.3d 338, 341 (Tex. 2000). "Our review requires that we consider the pleadings of the parties, the evidence presented at trial, and the charge in its entirety." De Leon v. Furr's Supermarkets, Inc. , 31 S.W.3d 297, 300 (Tex.App.-El Paso 2000, no pet.). "An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence." Columbia Rio Grande Healthcare, L.P. v. Hawley , 284 S.W.3d 851, 855-56 (Tex. 2009). "An appellate court will not reverse a judgment for a charge error unless that error was harmful[.]" Thota v. Young , 366 S.W.3d 678, 687 (Tex. 2012). As such, we will not reverse a judgment for charge error unless the error "probably caused the rendition of an improper judgment" and, even then, "only as to the part affected by the error." TEX.R.APP.P. 44.1(a)(1), (b).
1.
Breach of Contract by Hood
(Hood's Issues Two and Nine With Related Subissues)[14]
We first address the question of whether Hood agreed to-and breached *749 the Vernco Subcontract by failing to-pay Vernco all of the force account markups Hood received from TxDOT pursuant to Change Order 17.
In Hood's Issue Two, Hood argues that we should overturn the breach of contract verdict because, inter alia , the Vernco Subcontract never explicitly entitled Vernco to the FAMs. Instead, Section 4 of the Subcontract required Vernco to submit a written claim for an equitable increase in the contract price within ten days; Vernco never did so. As such, Hood never breached the contract terms.
In its brief, Vernco does not directly contest Hood's implicit claim that a written request for a price increase was a condition precedent to an equitable price adjustment under the language of Vernco Subcontract Section 4.[15] Rather, Vernco, echoing the argument it presented in the trial court, contends that the Subcontract as written , by incorporating the Prime Contract and the Blue Book by reference, created a web of reciprocal rights and *750 responsibilities that allowed Vernco to step into the shoes of the "contractor" for the Prime Contract's payment purposes, giving the company a direct right to all the FAMs that TxDOT gave Hood without having to first submit a written request to Hood. Vernco maintains that Hood breached the Subcontract by withholding those FAMs.
We agree that the Subcontract incorporates several documents by reference, but disagree with the contention that any of those documents automatically entitled Vernco to the FAMs. Section 4 of the Vernco Subcontract clearly controls the issue of subcontract price increases, and, as we explain below, Vernco's failure to request a price increase in writing is dispositive on the breach question.
Contract Construction Standards
The standard and scope of our review related to contract construction hinges on whether the contract is ambiguous or not. See Clayton Williams Energy, Inc. , 473 S.W.3d at 348. "To determine if a contract is ambiguous, we look only to its text and do not consult parol." Id. "If there is only one reasonable reading of a contract," the contract is unambiguous; "the parties' intent is a pure question of law and we are bound to interpret the terms of the contract as written and not how the parties would like them to have been written." Id. We review unambiguous contracts de novo , "limiting our scope of review to the 'four corners' of the document and excluding any extrinsic evidence from consideration." Id. If a contract is ambiguous, we review construction questions as questions of fact under the legal and factual sufficiency standards, and the scope of our review expands: "[a]n ambiguous contract opens the door to parol evidence that sheds light on the parties' true intent." Id.
"The goal of contract interpretation is to ascertain the parties' true intent as expressed by the plain language they used." Great Am. Ins. Co. v. Primo , 512 S.W.3d 890, 893 (Tex. 2017). Under the plain-language approach, "we assign terms their ordinary and generally accepted meaning unless the contract directs otherwise." Id. The plain-language inquiry is objective, not subjective. "A contract's plain language controls, not what one side or the other alleges they intended to say but did not." [Internal citation and quotation marks omitted]. Id. When interpreting a contract or other legal text, "we do not cherry-pick words and read them in a vacuum; we read them in their context within the document." Clayton Williams Energy, Inc. , 473 S.W.3d at 352. We strive to give meaning to all contract language so that no provision is rendered meaningless. Great American Ins. Co. , 512 S.W.3d at 893. Likewise, we also must avoid inserting language or provisions the parties did not use or "otherwise rewrit[ing] private agreements." Id. "We construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served and will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive." [Internal citations and quotation marks omitted]. Frost Nat'l Bank v. L & F Distrib., Ltd. , 165 S.W.3d 310, 312 (Tex. 2005) (per curiam). "However, parties make their own contracts, and it is not within the province of this court to vary their terms in order to protect them from the consequences of their own oversights and failures." [Internal citation and quotation marks omitted]. Springer Ranch, Ltd. v. Jones , 421 S.W.3d 273, 280 (Tex.App.-San Antonio 2013, no pet.).
Applicable Law: Breach of Contract
To prevail on a breach-of-contract claim, a party must establish the following elements:
*751 (1) a valid contract existed between the plaintiff and the defendant,
(2) the plaintiff tendered performance or was excused from doing so,
(3) the defendant breached the terms of the contract, and
(4) the plaintiff sustained damages as a result of the defendant's breach.
West v. Triple B Servs., L.L.P. , 264 S.W.3d 440, 446 (Tex.App.-Houston [14th Dist.] 2008, no pet.). "A breach of contract occurs when a party fails or refuses to do something he is contractually obligated to do." Cody Tex., L.P. v. BPL Expl., Ltd. , 513 S.W.3d 522, 535 (Tex.App.-San Antonio 2016, pet. denied). A material breach discharges or excuses the other party from continued performance on the contract; a non-material breach does not relieve the other party of complying with the contract, but simply gives the non-breaching party a cause of action for damages. Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc. , 518 S.W.3d 432, 436 (Tex. 2017).
a.
Did the Vernco Subcontract Directly Entitle Vernco to All Force Account Markups?
The trial court allowed for significant testimony at trial regarding the contracting parties' intent, the admission of which we deal with later in this opinion. However, the contract is not ambiguous, nor does either party argue that contract is ambiguous. We agree that the contract is unambiguously subject to only one reasonable reading. As such, on appeal, we consider only the contract's text in determining which party owed what obligations; the subjective understandings of any party or their agents do not matter in our analysis. Clayton Williams Energy, Inc. , 473 S.W.3d at 348.
Vernco's argument-as we understand it-is that the Vernco Subcontract's incorporation by reference of multiple documents also included the incorporation of "flow down" provisions in the Prime Contract that placed Vernco and Hood in the same relative position as Hood and TxDOT, thereby giving Vernco the ability to pass through Hood and obtain TxDOT benefits directly, since Vernco was the functional "contractor" for the portion of the Applewhite Project at issue.
Flow-down provisions "represent efforts to ensure consistency of obligations throughout the various tiers of the contracting process." Tribble & Stephens Co. v. RGM Constrs. , L.P. , 154 S.W.3d 639, 663 n.33 (Tex.App.-Houston [14th Dist.] 2004, pet. denied) (Seymore, J., plurality op.)(citing T. Bart Gary, Incorporation by Reference and Flow-Down Clauses , 10 CONSTRUCTION LAW. 1, 46 (Aug. 1990) ). The premise underlying Vernco's argument is that the mere presence of a flow-down provision in the Subcontract not only obligated Vernco to meet the specifications set out in the Prime Contract; it created a reciprocal duty on Hood that put Vernco and Hood in the same relative positions as Hood and TxDOT, entitling Vernco to reach up through the chain of contractors and receive the FAMs that TxDOT issued since Vernco was functionally the "contractor" in charge of specific work on Change Order 17. As authority for that proposition, Vernco cites a handful of federal district court cases. See Plum Creek Wastewater Auth. v. Aqua-Aerobic Sys., Inc. , 597 F.Supp.2d 1228, 1233 (D. Colo. 2009) ; Murdock & Sons Constr., Inc. v. Goheen Gen. Constr., Inc. No. IP 99-1723-C-T/F, 2002 WL 243576, at *6 (S.D. Ind. Jan. 14, 2002) (unpublished); United Tunneling Enters., Inc. v. Havens Constr. Co., Inc. , 35 F.Supp.2d 789, 794-95 (D. Kan. 1998).
*752 In turn, all federal district court cases point to an opinion by the Alaska Supreme Court. See Indus. Indem. Co. v. Wick Constr. Co. , 680 P.2d 1100, 1104 (Alaska 1984). In Industrial Indemnity Co. , the Alaska Supreme Court cited to two construction industry secondary sources in defining what effect a particular subcontract clause had:
Clause (a) is what is known as a flow down or conduit clause ... Such clauses are designed to incorporate into the subcontract those provisions of the general contract relevant to the subcontractor's performance. If a conduit clause is used, 'the same rights and duties should flow equally from the owner down through the general contractor to the subcontractor, as well as flowing from the subcontractor up through the general contractor to the owner.' ... The parties to the subcontract thus assume the correlative position of the parties to the prime contract. [Internal citations omitted].
Id. at 1104.
It is unclear whether in Industrial Indemnity the Alaska Supreme Court adopted a broad rule stating that all flow-down provisions automatically give all parties all correlative rights and responsibilities against any party above it in the contracting chain, but we have found no Texas authority holding that flow-down provisions should be read so broadly.[16] In any event, the provision in Industrial Indemnity specifically gave the subcontractor direct recourse against the owner without needing to first resort to the prime contractor, and none of the federal district cases Vernco cited hold that the mere existence of flow down provisions mean that subcontractors may always enforce rights against the prime contractor in the same way that the prime contractor would be able to enforce rights against the owner. Rather, the scope of what rights and responsibilities flow down or up through the various contractor tiers is determined by the language used in the flow down provision itself. See, e.g., Plum Creek Wastewater Auth. , 597 F.Supp.2d at 1233-34 (comparing the broader flow-down provision in the contract at issue to other narrower flow-down provisions in other cases); cf. Murdock & Sons Const., Inc. , 2002 WL 243576, at *2 (noting that the flow down provision explicitly gave the subcontractor "the benefit of all rights, remedies and redress against the Contractor that the Contractor ... has against the Owner"). We cannot assume that the presence of a flow-down provision in a contract automatically places a subcontractor and prime contractor in the same relative positions as the prime contractor and the owner, with all parties able to enforce rights and remedies against anyone in the contract tiers above them. The text of the contracts controls what responsibilities flows down and what rights flow up.
When viewing the Vernco Subcontract through this lens, we are not swayed by Vernco's arguments. Vernco points to the *753 following provisions of the Vernco Subcontract that it contends are flow-down provisions:
• Vernco was required to perform all work specified in the Subcontract "in accordance with the terms and provisions of [the Prime Contract] ... including all the General and Special Conditions, Drawings, Specifications and other documents forming or by reference thereto[.]"
• Vernco must satisfactorily complete its work pursuant to "plans, specs, and requests ... as designated in the Prime Contract to the full satisfaction of" TxDOT.
• Vernco must "undertake, assume and discharge the obligations of the Contractor, furnishing all materials, labor, tools, and equipment, whether owned or rented, necessary move-ins, and subsidiary work, in connection with and for the completion of" the specific work described in the Vernco Subcontract.
• Section 11(f): "The Subcontractor assumes toward the Contractor all the obligations and responsibilities that Contractor assumes toward the Owner[.]"
Vernco also directs our attention to the following sections of the Blue Book, incorporated by reference into the Vernco Subcontract:
• Blue Book § 1.14 says the Prime Contract would "include, but not be limited to, the Plans, Standard Specifications incorporated by reference, Special Provisions, Special Specifications, Contract Bonds and Supplemental Agreements." Special Provision 001-182 added "Change Orders" to that definition as well.
• Blue Book § 1.15, defining "Contractor" as "[t]he individual, firm or corporation or any combination thereof, Party of the Second Part, with which the contract is made by the State."
• Blue Book § 9.4, dealing with force account work percentages to "be paid to the Contractor." Special Provision 009-062 supplemented this provision by adding: "The prime Contractor will be paid for administrative cost only when extra work, ordered by the Engineer, is performed by a subcontractor or a collection of subcontractors. The payment for administrative costs will not exceed five percent (5%) of the total subcontracted extra work."
Vernco's understanding of the Subcontract simply does not square with the Subcontract's text. All of these flow-down provisions exist to ensure that Vernco, as subcontractor, would meet all the specifications that TxDOT required of Hood in the Prime Contract. As for payments and the rights of subcontractors, the provisions of the Prime Contract that Vernco cites do not mention anything about subcontractors. Instead, Blue Book § 9.4 provides that force account percentages are to "be paid to the Contractor," defined in Blue Book § 1.15 as the "Party of the Second Part, with which the contract is made by the State." Here, the "Contractor" is clearly Hood as the prime contractor in the agreement with TxDOT. FAMs are to be paid to Hood.
Vernco also argues that Special Provision 009-062 operates as a limitation on Hood's entitlement to FAMs. We disagree. That Special Provision in Article 9.4 provides that when "extra work, ordered by the Engineer, is performed by a subcontractor or a collection of subcontractors[,]" TxDOT agreed to pay an extra administrative cost not to exceed five percent of the total subcontracted work. Nothing about Special Provision 009-062 limits Hood's recovery to only five percent of the FAMs.
*754 Rather, TxDOT's payment of an administrative cost markup is in addition to the FAMs described in Blue Book § 9.4. And again, nothing about any of these provisions mentions payment to subcontractors. The Prime Contract leaves the question of subcontractor payments open, as a separate matter to be discussed between the prime contractor and its subcontractors. The Prime Contract provides no enforceable rights to Vernco.
In light of the Prime Contract's silence on the issue of subcontractor payments, we must descend one tier and look to the Subcontract itself. Section 4 of the Vernco Subcontract specifically deals with price adjustments between Vernco and Hood. But Section 4 also makes no mention of FAMs. Rather, it only provides for an equitable adjustment of price contingent on a request for a price increase. In short, nothing in the Prime Contract or the Subcontract provides Vernco with the direct right to all FAMs paid by TxDOT. The fact that consultants for both Hood and Vernco both believed Vernco would be entitled to the FAMs has no bearing on our interpretation of this unambiguous contract, nor can those consultants' testimony or subjective understanding of the contract contravene the contract's plain text. Hood's argument carries the day.
In a second line of reasoning, Vernco insists that its reading of the Subcontract as providing it with the direct right to the FAMs must be correct because otherwise, the Subcontract would require Vernco to perform even though Vernco was in a negative cash-flow position, making it economically unreasonable to perform the contract. But total performance in light of changing circumstances is exactly what Vernco bargained for in the Subcontract when it submitted a hard bid. Section 4 not only gives the general contractor the power to add or subtract things from the Subcontract, but it explicitly requires Vernco to execute those changes-no questions asked:
The Contractor may at any time by written order of Contractor's authorized representative, and without notice to the Subcontractor's sureties, make changes in, additions to and deletions from the work to be performed and materials to be furnished under this Subcontract, and the Subcontractor shall promptly proceed with the performance of this Subcontract as so changed. [Emphasis added].
To mitigate any hardship that came from contract additions, Vernco had the right to file a written claim against Hood for an equitable increase in compensation if the hard-bid amount originally submitted was deemed inadequate. We see nothing inherently inequitable or oppressive about this arrangement.
The fact that Vernco did not anticipate being in a tight position financially when it submitted an initial hard bid that left the parties to hash out the details of further price increases later did not make the contract oppressive at the outset. "The intent of a contract is not changed simply because the circumstances do not precisely match the scenarios anticipated by the contract." SAS Inst., Inc. v. Breitenfeld , 167 S.W.3d 840, 841 (Tex. 2005) (per curiam). Changing circumstances are always a background risk in submitting a hard bid.
The contract language governing the particular issue at bar does not support Vernco's argument, nor is Hood's reading of the contract requirements oppressive. Hood did not owe Vernco any FAMs as a matter of course; it only owed Vernco an equitable adjustment of contract price conditioned on a written request for a price increase that Vernco never submitted. Based on our read of the contract and the *755 arguments raised by the parties as we understand them, Vernco cannot succeed on its breach of contract cause of action against Hood.
In short, the Subcontract did not entitle Vernco to the FAMs per se. Rather, the Vernco Subcontract shows that Vernco submitted a hard bid for a set price. Section 4 of the Subcontract entitled Vernco to receive, within ten days of filing a written claim to Hood, an equitable adjustment of the contract price. The text is clear, unambiguous, and governs the issue at hand. Because the evidence is undisputed that no written claim was ever made, and because Vernco does not otherwise argue that it was excused from complying with Section 4 or that it entered into a subsequent oral contract with Hood as to how the FAMs would be split,[17] Vernco cannot establish that Hood ever breached the Subcontract for failing to pay the FAMs as a matter of law.
Hood's Issue 2(b) is sustained. We vacate the awards of damages and attorney's fees related to the breach of contract claim, and render judgment that Vernco take noting against Hood on the claim for breach of contract. We decline to address Issues 2(a) and 2(c) through 2(h) as unnecessary to the resolution of this appeal. We also decline to address Issue Nine and the subissues contained therein dealing with jury charge issues related to the trial court's breach of contract instructions; because the breach of contract judgment is reversed and rendered, consideration of these jury charge issues would be advisory and unnecessary to the resolution of this appeal.
2.
Tortious Interference with the Vernco Subcontract (Nelson's Issues Eight through Eleven)
Having dealt with the jury's verdict on the breach of contract cause of action, we now turn our attention to the tortious interference portion of the verdict. In Nelson's Issue Eight, he contends that the jury's finding that he tortiously interfered with the Vernon Subcontract is unsupported by legally sufficient evidence.
We agree.[18]
Applicable Law
"To establish a claim for tortious interference with a contract, a plaintiff must establish: (1) the existence of a valid contract subject to interference; (2) that the defendant willfully and intentionally interfered with the contract; (3) that the interference proximately caused the plaintiff's injury; and (4) that the plaintiff incurred actual damage or loss."
*756 Cmty. Health Sys. Prof'l Servs. Corp. v. Hansen , 525 S.W.3d 671, 689 (Tex. 2017) ; see also Butnaru v. Ford Motor Co. , 84 S.W.3d 198, 207 (Tex. 2002).
"Not every act which interferes with another's contract relations is tortious." Caller-Times Pub. Co., Inc. v. Triad Commc'ns, Inc. , 855 S.W.2d 18, 21 (Tex.App.-Corpus Christi-Edinburg 1993, no writ). "To prove the willful and intentional interference element of a tortious interference claim, the plaintiff must show that the defendant was legally capable of tortious interference." Hansen , 525 S.W.3d at 690. There must also be evidence that the intervenor induced a contracting party into breaching the contract. El Paso Healthcare Sys., Ltd. v. Murphy , 518 S.W.3d 412, 421-22 (Tex. 2017). While a terminable-on-notice or terminable-at-will contract may be subject to interference, ordinarily, merely inducing a contract obligor to do what it already has a right to do is not actionable interference. ACS Inv'rs, Inc. v. McLaughlin , 943 S.W.2d 426, 430 (Tex. 1997) ; Faucette v. Chantos , 322 S.W.3d 901, 914 (Tex.App.-Houston [14th Dist.] 2010, no pet.).
a.
Was Nelson, as Guarantor, a Stranger to the Vernco Subcontract?
Nelson asserts that he is essentially immune from liability for tortious interference with the Vernco Subcontract because he was privileged in two different ways.
First, Nelson maintains that as the Vernco Subcontract's guarantor, he could not interfere with the subcontract as a matter of law because his status as guarantor made him a virtual party to the Vernco Subcontract. We disagree with that proposition. Guarantors are not considered parties to the contracts they guarantee.
Ordinarily, the tortfeasor "must be a stranger to the contract with which he allegedly interfered." Hansen , 525 S.W.3d at 690. "[T]here can be no tortious interference when there is a complete identity of interests between a party to a contract and the defendant who is accused of interfering with the contract." Cleveland Reg'l Med. Ctr., L.P. v. Celtic Props., L.C. , 323 S.W.3d 322, 346 (Tex.App.-Beaumont 2010, pet. denied) ; cf. Holloway v. Skinner , 898 S.W.2d 793, 795 (Tex. 1995) (noting that allowing tortious interference claims when "identity of interest exists" where "person who induces the breach" is a contracting party "would convert every breach of contract claim" into a claim for tortious interference).
"A guaranty is a separate contract distinct from the primary obligation." Ashcraft v. Lookadoo , 952 S.W.2d 907, 913 (Tex.App.-Dallas 1997, pet. denied). "Guaranties can therefore be modified or released like any other contractual agreement without affecting the original obligation." Id. at 913. As a technical matter, Nelson was not a party to the Vernco Contract. Further, although the interests of a guarantor and the principal debtor are somewhat aligned, we cannot categorically say there is a complete identity of interests between them that would prevent a guarantor from being liable for tortious interference in the principal debtor's contract. Matters can certainly turn adverse quickly between a guarantor and the principal debtor in the event of a default on the primary obligation. As such, we hesitate to endorse Nelson's position on this point.
b.
Interference by a Corporation's Own Agent
Nelson's stronger argument is that he could not interfere with the Vernco Subcontract because he was Vernco's *757 agent-specifically, Vernco's vice president. However, Nelson's status as a corporate agent does not insulate him from potential liability for tortious interference with the Vernco Subcontract.
"Corporations, by their very nature, cannot function without human agents." Holloway , 898 S.W.2d at 795. While acts by a corporate agent are generally deemed to be the acts of the corporation, a corporate agent can still be liable for tortious interference with the principal's contract. Holloway , 898 S.W.2d at 795. Nevertheless, the bar for proving interference by a corporation's own agent is set fairly high. When a corporate agent is accused of interfering with the corporation's contractual relations, "the plaintiff must show that the defendant acted in a fashion so contrary to the corporation's best interests that his actions could only have been motivated by personal interests." Id. at 796. "[T]he mere existence of a personal stake in the outcome, especially when any personal benefit is derivative of the improved financial condition of the corporation or consists of the continued entitlement to draw a salary, cannot alone constitute proof that the defendant committed an act of willful or intentional interference." Id. at 796. "A corporate officer or director may not be held liable for inducing the corporation to violate a contractual obligation as long as he or she acts in good faith on the corporation's behalf." ACS Inv'rs, Inc. v. McLaughlin , 943 S.W.2d 426, 432 (Tex. 1997). Because there is conflicting evidence as to whether Nelson was acting on the corporation's behalf, we also cannot say he is categorically immune from liability here as a corporate officer.
c.
Did Nelson's action constitute actionable interference?
While neither Nelson's status as Vernco's vice president nor his status as guarantor of the Vernco Subcontract insulate him from potential liability for tortious interference with the Vernco Subcontract, Vernco still bore the burden of showing Nelson legally interfered with the Subcontract. We do not believe interference can be shown on this record.
Vernco's theory of the case for this cause of action centers almost entirely on Nelson's conveyance of the insurance lapse information to Hood without first telling Claflin. But Nelson's conveyance of this information, standing alone, is insufficient to show tortious interference. There is no evidence that Nelson's actions led Hood to breach the Vernco Subcontract. As we stated previously, there is insufficient evidence to show Hood ever breached the contract, since Vernco was not automatically entitled to the FAMs, Vernco never timely submitted a written request for a prince increase, Vernco never argued it was excused from complying with the price increase provisions of the Subcontract, and Vernco never identified any other conduct that would constitute a breach. On the contrary, the lapse of Vernco's insurance coverage gave Hood good cause to terminate the Vernco Subcontract for breach as per Section 31. Thus, even if Nelson had ulterior motives in relaying the insurance lapse information to Hood, Nelson's actions only induced Hood into doing that which it already had the right to do-i.e., terminate the Vernco Subcontract for a material breach. That action may have interfered with the Vernco Subcontract, but it does not meet the definition of tortious interference.
Tortious interference with the Vernco Subcontract cannot be established as a matter of law. Nelson's Issue Eight is sustained. Because Nelson could not be liable for tortious interference with a contract, we also sustain Nelson's Issue Eleven *758 dealing with damages for tortious interference with a contract. We decline to address Nelson's Issues Nine and Ten as unnecessary to the resolution of this appeal. TEX.R.APP.P. 47.1.
3.
Breach of Fiduciary Duty
(Nelson's Issues Two and Four/Hood's Issue Three and Related Subissues)[19]
If Nelson were a stranger or outside competitor of Vernco, our analysis would be complete here. But Nelson was not a stranger or outsider in this case; Nelson was Vernco's corporate vice president. That complicates matters. Although Nelson may not have interfered with the Vernco Subcontract as a technical matter, his assumption of the Vernco Subcontract after its cancellation, particularly in light of moves he made to acquire insurance for his own personal company in the lead-up to the cancellation, raises the question of whether Nelson intended to divert a corporate opportunity to himself, thereby breaching his fiduciary duty to Vernco as a corporate executive.
In Nelson's Issues Two and Four, Nelson maintains that the trial court erroneously submitted an instruction on breach of fiduciary duty and then rendered judgment on the jury's verdict for Vernco with respect to breach of fiduciary duty when no evidence raised at trial justified either action. Vernco implicated Hood in Nelson's breach of fiduciary duty by submitting a jury question as to whether Hood knowingly participated in Nelson's breach of his fiduciary duty to Vernco. The jury responded yes. Hood's liability here is contingent on a predicate finding of breach of fiduciary duty by Nelson. As such, Hood also challenges the trial court's findings on both Nelson's breach of a fiduciary duty and Hood's encouragement of such act in Hood's Issues 3(a) through 3(e).
Fiduciary Duty Standard
"Whether a fiduciary duty exists is a question of law" that we review de novo. See Nat'l Plan Adm'rs, Inc. v. Nat'l Health Ins. Co. , 235 S.W.3d 695, 700 (Tex. 2007). "[N]ot every relationship involving a high degree of trust and confidence rises to the stature of a fiduciary relationship." [Internal citation and quotation marks omitted]. Meyer v. Cathey , 167 S.W.3d 327, 330 (Tex. 2005). "There are two types of fiduciary relationships in Texas: (1) a formal *759 fiduciary relationship arising as a matter of law, such as between partners or an attorney and a client, and (2) an informal or confidential fiduciary relationship arising from a moral, social, domestic, or merely personal relationship where one person trusts in and relies upon another." E & E Serv. & Supply, Inc. v. Ruddick , No. 11-14-00055-CV, 2016 WL 3941079, at *4 (Tex.App.-Eastland July 14, 2016, no pet.) (mem. op.). Agency is "a special relationship that gives rise to a fiduciary duty." Johnson v. Brewer & Pritchard, P.C. , 73 S.W.3d 193, 200 (Tex. 2002). Nelson does not contest that, as corporate vice president, he was Vernco's fiduciary. See Ritchie v. Rupe , 443 S.W.3d 856, 868 (Tex. 2014) (holding that corporate officers "owe a fiduciary duty to the corporation in their directorial actions, and this duty includes the dedication of [their] uncorrupted business judgment for the sole benefit of the corporation")[Internal quotation marks omitted].
The real issue in this case is the scope of Nelson's fiduciary duty. "[C]ourts have been and should be careful in defining the scope of the fiduciary obligations an employee owes when acting as the employer's agent in the pursuit of business opportunities." Johnson , 73 S.W.3d at 201. "[F]actors which must be taken into consideration when determining the scope of an agent's fiduciary duty to his or her principal include not only the nature and purpose of the relationship, but also agreements between the agent and principal." Nat'l Plan Adm'rs, Inc. , 235 S.W.3d at 700.
Among the agent's fiduciary duties to the principal is the duty to account for profits arising out of the employment, the duty not to act as, or on account of, an adverse party without the principal's consent, the duty not to compete with the principal on his own account or for another in matters relating to the subject matter of the agency, and the duty to deal fairly with the principal in all transactions between them.
Johnson , 73 S.W.3d at 200 (citing RESTATEMENT (SECOND) OF AGENCY § 13, cmt. a (1958) ). An agent who diverts an opportunity from the principal or engages in competition with the principal and profits or benefits therefrom has violated his fiduciary duty. Id.
Analysis
Vernco responds to the Appellants by arguing that Nelson breached his fiduciary duty toward Vernco in three ways. First, Vernco alleges that Nelson breached his duty of candor to Vernco by both withholding information about the lapse in insurance coverage from Claflin on the Applewhite Project and by misleading Claflin about the potential profitability of inefficiency claims related to the separate Pat Booker Project. Second, Vernco maintains that Nelson breached his fiduciary duty by failing to timely prosecute the Pat Booker Project inefficiency claims as promised. Third, Vernco asserts that Nelson also breach his duty of loyalty by diverting the Vernco Subcontract on the Applewhite Project toward his own company, Collective Contracting.
This is a close-call issue.
The question for us is whether there was more than a scintilla of evidence that would allow a reasonable jury to conclude that Nelson's desire to obtain the Vernco Subcontract for his own company began before Vernco defaulted on its insurance coverage obligation. We believe there is. The evidence suggests to a reasonable person that even before he received the news of Vernco's imminent insurance coverage lapse, Nelson was already positioning himself to take over the Vernco Subcontract. The jury could also infer that Nelson's *760 conveyance of the imminent insurance lapse information to Hood after Nelson attempted to get insurance coverage for his own company without attempting to first reinstate coverage for Vernco could constitute evidence that he was not acting in Vernco's best interest, that he sought to precipitate the Vernco Subcontract's demise, and that he was not dealing with Vernco and Claflin fairly.
Nelson maintains that as a technical matter he cannot be held liable for breach of fiduciary duty because Vernco consented to him acting as its guarantor; thus, by assuming the remaining work on the Applewhite Project, Nelson was in fact acting in Vernco's best interest. The jury was free to find that when Nelson's company Collective Contracting completed the remainder of the work outlined in the Vernco Subcontract, Nelson was not acting as a guarantor of Vernco's debts. Instead, the evidence is sufficient to show that Nelson, through Collective Contracting, acted as Vernco's competitor. Nelson used his job as vice president of Vernco to develop an ongoing relationship with Hood. Nelson positioned himself to take advantage of an upcoming potential breach of contract by attempting to procure insurance coverage for his personal firm. Then, as Vernco's insurance coverage was set to expire, which would give Hood cause to terminate the Vernco subcontract for breach, Nelson told Hood about the insurance issue, but not Claflin.
Nelson complains that he should not be held liable for making the disclosure, since he says that failing to make the disclosure would have been tantamount to perpetrating a fraud on Hood. But Nelson's scope is too narrow. We take this action in the context of all his action during the course of this transaction. By making the disclosure, Nelson also set the machinery in motion for Hood to terminate Vernco's subcontract, opening himself up to take that work over without having to pay off Vernco's debts. As a result of Nelson's action, Hood fired Vernco, and Nelson was able to divert money slated to go to Vernco under the Subcontract while leaving Vernco to pay the bills it already incurred. Nelson benefited by turning his company from essentially a shell corporation into a company with real assets. Tellingly, no party points to any record evidence that Nelson ever personally paid back money Vernco owed to others.
We hold that the evidence is both legally and factually sufficient to show that Nelson placed his own self-interest above that of Vernco, thereby breaching his fiduciary duty to Vernco.[20]
Nelson's Issue Two is overruled.
Evidence Implicating Hood in Nelson's Breach of Fiduciary Duty
(Hood's Issues 3(a) through 3(e) )
Hood, in Hood's Issue Three Subsections (a) through (e), argues that even if Nelson breached his fiduciary duty toward Vernco, there is no legally or factually sufficient evidence implicating Hood as a knowing participant in Nelson's breach. We disagree.
"[U]nder Texas common law, if a third party knowingly participates in a defendant's breach of a fiduciary duty owed to a plaintiff, the third party is jointly liable with the defendant for damages to *761 the plaintiff proximately caused by this breach of fiduciary duty, and the plaintiff has the same equitable remedies against the defendant and the third party based upon this breach." Hunter Bldgs. & Mfg., L.P. v. MBI Glob., L.L.C. , 436 S.W.3d 9, 15 (Tex.App.-Houston [14th Dist.] 2014, pet. denied).[21] The plaintiff alleging knowing participation must show (1) the defendant knew of the fiduciary relationship and (2) was aware of his participation in the third party's breach of its duty. CBIF Ltd. P'ship v. TGI Friday's, Inc. , No. 05-15-00157-CV, 2017 WL 1455407, at *16 (Tex.App.-Dallas Apr. 21, 2017, pet. filed).
Evidence that Hood was a party to Nelson's breach of his fiduciary duty to Vernco includes the following:
(1) Hood hired Collective Constructing to finish the Vernco Subcontract despite the fact that it was not a TxDOT qualified subcontractor, despite the fact that Collective Contracting had no employees and virtually no assets, and despite the fact that Collective Contracting, like Vernco, did not have liability insurance in effect at the time it was hired.
(2) Hood advanced money to Collective Contracting in the form of an interest-free loan that allowed Collective Contracting to obtain liability insurance and cover payroll costs for a few months.
(3) By transferring the Vernco Subcontract to Collective Contracting-which was essentially a shell corporation existing only on paper at the time the contract was signed-instead of simply hiring Nelson to work for Hood in-house, Hood was able to receive a five percent administrative cost markup from TxDOT for using a 'subcontractor' to perform work.
(4) There is evidence of 'bad blood' on the part of Hood that arose after the National Waterworks dispute.
In light of these factors, there is more than a scintilla of evidence to support the jury's finding that Hood knowingly participated in Nelson's breach of fiduciary duty. The finding is also not against the great weight and preponderance of the evidence.
Hood's Issue Three Sub-Issues (a) through (e) are overruled.[22]
4.
Fraud and Conspiracy to Defraud
(Nelson's Issue Five; Hood's Issue Four and Related Sub-issues)[23]
One of Vernco's causes of action against Hood and Nelson was fraud. As we *762 understand from Vernco's appellee brief, Vernco accuses Hood and Nelson of inducing Vernco into obtaining credit extensions by falsely representing future potential profitability on the Vernco Subcontract. Their goal, according to Vernco, was to force Vernco to absorb early losses on the subcontracted work and then cut Vernco out and replace the company with Collective Contracting the moment the subcontract became profitable.
In Hood's Issue Four and Nelson's Issue Five, both Appellants challenge the legal sufficiency of the fraud verdict.[24] We agree that the evidence underpinning the fraud verdict is legally insufficient.
The elements of fraud are:
(1) that a material representation was made;
(2) the representation was false;
(3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion;
(4) the speaker made the representation with the intent that the other party should act upon it;
(5) the party acted in reliance on the representation; and
(6) the party thereby suffered injury.
Aquaplex, Inc. v. Rancho La Valencia, Inc. , 297 S.W.3d 768, 774 (Tex. 2009).[25]
Vernco alleges that Hood and Nelson conspired to fraudulently induce Claflin into believing Hood would pay Vernco the FAMs when Hood had no intent of paying Vernco the FAMs. Relying on this representation, Vernco and Claflin personally *763 obtained lines of credit to keep Vernco afloat until the National Waterworks claim was paid off, at which point Hood terminated Vernco and hired Collective Contracting.
But even viewing the evidence in the light most favorable to Vernco, Vernco did not suffer injury based on any representation made by Hood or Nelson. Vernco suffered injury because Hood terminated the Vernco Subcontract for cause once Vernco's insurance coverage lapsed as a result of Vernco's non-payment of its bills. Thus, even if Hood or Nelson made false representations about profitability and even if Hood had promised specific FAM payments to Vernco that Vernco never received (Vernco never fully elaborates on specific details as to either of these points or shows anything definitive on these points either way), the proximate cause of Vernco's damages was its own failure to adhere to the terms of the Subcontract. Fraud cannot be established on this record, and consequently, neither can conspiracy to defraud.
Nelson's Issue Five and Hood's Issue Four are sustained to the extent this Court has jurisdiction to entertain those challenges. Because we have sustained the fraud and conspiracy points on the merits, we decline to address Hood's Issue Five and Nelson's Issues Six and Twelve regarding jury charge error as unnecessary to the resolution of this appeal. See TEX.R.APP.P. 47.1. We also decline to address Nelson's Issue Six dealing with the calculations of fraud damages.
C.
DAMAGES ISSUES
We next address a cluster of issues related to damages related to the one surviving cause of action. The jury found that Nelson breached his fiduciary duty toward Vernco. The jury also found that Hood knowingly participated in Nelson's breach, rendering Nelson and Hood jointly and severally liable. As we stated previously, those findings rested upon legal sufficient evidence. Because the only cause of action that has survived our legal sufficiency review is the breach of fiduciary duty cause of action, we will only address verdict questions related to that cause of action.
In terms of actual damages stemming from Nelson's breach of fiduciary duty, the jury found that Vernco suffered: (1) $1,191,758.00 in lost profits from non-force account work, (2) $2,122,978.00 in lost profits from force account work, (3) $511,000.00 in lost business value, and (4) $350,000.00 from Nelson's failure to pursue inefficiency claims related to the Pat Booker Project. The jury also made findings that both Nelson and Hood acted with malice. That opened the door for exemplary damages. The jury assessed a $150,000.00 exemplary damage award against Nelson individually and a $150,000.00 exemplary damage award against Hood individually.
Both Hood and Nelson challenge the legal and factual sufficiency of the malice findings made against them. Nelson individually challenges the legal sufficiency of the $350,000 damages award stemming from his alleged failure to pursue the Pat Booker Project inefficiency claims. Hood challenges the legal sufficiency of the $2.1 million force account lost profits findings; Nelson maintains that award should be reversed based on improper expert testimony.
Standard of Review
If the evidence is legally insufficient as to damages, we do not reverse and remand for a new trial on every issue, but only the issue of damages.
*764 Applicable Law: Damages
Actual Damages
"Actual damages are those damages recoverable under common law." [Citations omitted]. Arthur Andersen & Co. v. Perry Equip. Corp. , 945 S.W.2d 812, 816 (Tex. 1997). Actual damages are considered to be either "direct" or "consequential." Id. The Texas Supreme Court has summarized the difference this way:
Direct damages are the necessary and usual result of the defendant's wrongful act; they flow naturally and necessarily from the wrong. Direct damages compensate the plaintiff for the loss that is conclusively presumed to have been foreseen by the defendant from his wrongful act.
Consequential damages,[26] on the other hand, result naturally, but not necessarily, from the defendant's wrongful acts. Under the common law, consequential damages need not be the usual result of the wrong, but must be foreseeable, and must be directly traceable to the wrongful act and result from it.... [I]f damages are too remote, too uncertain, or purely conjectural, they cannot be recovered. [Internal citations omitted].
Id. at 816.
Exemplary Damages
"[T]hough we must presume that a plaintiff has been made whole for his injuries by compensatory damages, exemplary damages are permitted if the wrongdoing is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." [Internal citations and quotation marks omitted]. Bennett v. Reynolds , 315 S.W.3d 867, 874 (Tex. 2010). Exemplary damages are also known as punitive damages. "[P]unitive damages are generally available for common law torts so long as the traditional prerequisites are met: a finding of actual damages and outrageous, malicious, or otherwise reprehensible conduct[.]" [Internal citations omitted]. Safeshred, Inc. v. Martinez , 365 S.W.3d 655, 660 (Tex. 2012). "The type of malice necessary to support punitive damages varies with the nature of the wrongful act at issue in any given category or particular type of case." Cont'lCoffee Prod. Co. v. Cazarez , 937 S.W.2d 444, 453 (Tex. 1996).
Consequential/Special Damages: Recovery of $350,000 for Failure to File Inefficiency
Claims
(Nelson's Issues Three and Four)
We first deal with the actual damages issues, since actual damages are a prerequisite to review of punitive damages. In Issue Three, Nelson alleges that the trial court erred by submitting a damages question on Nelson's failure to pursue inefficiency claims related to the breach of fiduciary duty question. In Issue Four, Nelson argues that there is legally and factually insufficient evidence to support the jury's damages award related to the failure to pursue inefficiency claims.
Fatal Variance Between Pleadings and Judgment
In Nelson's Issue Three, he asserts that Vernco should not be allowed to collect the $350,000 in damages attributable to his failure to file inefficiency claims because those were special/consequential damages[27] that should have been, but *765 were not, pleaded in Vernco's live petition; Vernco only explicitly sought to recover "lost profits" resulting from Nelson's breach. See TEX.R.CIV.P. 56 ("When items of special damage are claimed, they shall be specifically stated."). Vernco counters that Nelson waived any challenges to pleading defects by failing to file special exceptions, and the issue of damages related to inefficiency claims was tried by consent.
We agree with Vernco.
"Every defect, omission or fault in a pleading either of form or of substance, which is not specifically pointed out by exception in writing and brought to the attention of the judge in the trial court before the instruction or charge to the jury ... shall be deemed to have been waived by the party seeking reversal on such account[.]" [Emphasis added]. TEX.R.CIV.P. 90.
While Nelson verbally objected to the inclusion of the instruction at the jury charge conference, Nelson directs us to nothing in the record that would show he ever filed an objection in writing as required by Rule 90. Thus, any objection to Vernco's failure to bring up the specific issue in a pleading has been waived.
Issue Three is overruled.
Unpleaded Contract Liability Recast as Tort Liability?
In Issue Four, Nelson argues that the trial court improperly held him liable for certain tort damages when the allegation underpinning those damages showed there was, at most, a breach of contract on his part. Specifically, Nelson maintains the damages assessed for failing to file the inefficiency claims on Vernco's behalf are not recoverable in connection with the breach of fiduciary duty action because simple nonfeasance of an employment duty represents a breach of an employment contract that creates contractual liability, not tort liability. See Sw. Bell Tel. Co. v. DeLanney , 809 S.W.2d 493, 495 n.2 (Tex. 1991). Further, in the event of a contractual breach for nonfeasance, the appropriate measure of direct damages would be only a return of salary or wages. Arthur Andersen & Co. v. Perry Equip. Corp. , 945 S.W.2d 812, 816 (Tex. 1997). As such, Nelson urges us to find that the line-item on the damages verdict dealing with his failure to file inefficiency claims is non-compensable.
We disagree under these facts.
Nelson is correct that, generally, "there is no tort liability for nonfeasance, i.e., for failing to do what one has promised to do in the absence of a duty to act apart from the promise made." DeLanney , 809 S.W.2d at 495 n.2. An action for nonfeasance springs from contractual or quasi-contractual liability, and a party that waives a contractual liability claim by failing to plead that theory cannot recover by recasting the claim as a tort claim. Id. at 495. In DeLanney , a telephone customer sued Southwestern Bell after it failed to run his business' advertisement in the Yellow Pages. While the customer had a contract with Southwestern Bell for the advertisement services, the claim was submitted to the jury as a negligence claim. The Texas Supreme Court rejected negligence liability as a basis for recovery under these facts, finding that the claim sounded in contract only. The Court distinguished the situation *766 from another situation in Montgomery Ward & Co. v. Scharrenbeck , 146 Tex. 153, 204 S.W.2d 508, 510 (1947), a case in which a customer's house burned down after a worker from Montgomery Ward, pursuant to a contract with the customer, negligently installed a water heater. The DeLanney Court held that in determining whether liability sounds in tort or in contract, the nature of the injury is a key factor. "If the defendant's conduct-such as negligently burning down a house-would give rise to liability independent of the fact that a contract exists between the parties, the plaintiff's claim may also sound in tort. Conversely, if the defendant's conduct-such as failing to publish an advertisement-would give rise to liability only because it breaches the parties' agreement, the plaintiff's claim ordinarily sounds only in contract." DeLanney , 809 S.W.2d at 494. Additionally, courts must "examine the nature of the plaintiff's loss." Id. "When the only loss or damage is to the subject matter of the contract, the plaintiff's action is ordinarily on the contract."
If Nelson were an ordinary employee, his argument that this case is like DeLanney would likely be correct. Vernco apparently alleges nonfeasance on an employment contract, and since Vernco failed to plead a breach of contract claim against Nelson, recovery on that theory would be waived. Id. at 495. But Nelson was no ordinary employee. As a corporate officer, he was Vernco's fiduciary, which created duties imposed by tort law separate and apart from his mere contractual obligations. Cf. ids="9987319" index="126" url="https://cite.case.law/sw2d/809/493/">id. at 494 n.1 (noting that "some contracts involve special relationships that may give rise to duties enforceable as torts, such as professional malpractice"). While his failure to pursue inefficiency claims could give rise to contractual or quasi-contractual promise-based liability, it could also support separate tort liability for breach of fiduciary duty. A corporate director's fiduciary duties encompass a duty of due care and a duty to place the company's interests above his own. Ritchie , 443 S.W.3d at 868 ; Gearhart Indus., Inc. v. Smith, Inten. Inc. , 741 F.2d 707, 720-21 (5th Cir. 1984) (describing Texas law on corporate director's duty of care). When viewed in context, the jury could correctly view Nelson's failure to pursue inefficiency claims as being part of a pattern of behavior representing his placement of his own business interests above that of Vernco's. We find nothing under these facts that would prevent the jury from considering the inefficiency claims in its damages verdict.
Legal and Factual Sufficiency
Finally, Nelson argues that even if he may be held liable for the failure to pursue inefficiency claims, he should not be held liable under these facts because Vernco was able to recoup the same amount or more in subsequent change orders issued by TxDOT. As such, Vernco suffered no damages as a matter of law, and the evidence is legally insufficient to support that portion of the damages verdict. Vernco contests Nelson's characterization of the facts, arguing that it was never able to recoup the full amount of inefficiency claims because the change orders happened after Vernco was no longer working on the Applewhite Project.
"Where the law furnishes no legal measure of damages and they are unliquidated, the amount to be awarded rests largely in the discretion of the jury[.]" Horton v. Robinson , 776 S.W.2d 260, 266 (Tex.App.-El Paso 1989, no writ). In light of the conflicting state of the evidence, the jury was free to accept Vernco's assertions regarding the inefficiency claims and find *767 that $350,000 represented a fair amount that would allow Vernco to recoup what it lost due to Nelson's breach of his fiduciary duty.
Nelson's Issue Four is overruled.
Actual Damages: Lost Business Value and Lost Profits
(Nelson Issue Thirteen)
The next few points related to actual damages figures have the Appellants arguing alternating evidentiary error and sufficiency grounds on different points, all hinging on the supposed unreliability of the testimony of Vernco's damages expert, S. Todd Burchett. In Nelson's Issue Thirteen, Nelson contends that the jury's verdict should be reversed because Vernco's expert witness Burchett provided the jury with a flawed and unreliable analysis.
We address the lost business value portion of the damages verdict first before turning to the lost profits portion.
Lost Business Value
Nelson's chief argument is that Burchett improperly calculated Vernco's lost business value by using a starting point several months before the events at issue here and an ending point immediately after the events at issue. Nelson maintains that Burchett should have conducted his analysis using a starting point from immediately before the events at issue and an ending point immediately after the events at issue. Nelson further contends a proper analysis would have taken into account a $3.7 million loss that Vernco reported the Internal Revenue Service on a tax return.
"A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." TEX.R.EVID. 702. The trial court, serving in a gatekeeping function, makes the initial determinations of whether an expert is qualified and whether the expert's testimony is relevant and based on a reliable foundation. Helena Chem. Co. v. Wilkins , 47 S.W.3d 486, 499 (Tex. 2001). In assessing reliability of the testimony, a trial court must evaluate the expert's methods, analysis, and principles relied on in reaching an opinion, and "ensure that the opinion comports with applicable professional standards outside the courtroom and that it will have a reliable basis in the knowledge and experience of the discipline." [Internal citation omitted]. Id. "[E]xpert testimony based on an unreliable foundation or flawed methodology is unreliable and does not satisfy Rule 702 's relevancy requirement." TXI Trasp.Co. v. Hughes , 306 S.W.3d 230, 234 (Tex. 2010).
Burchett testified that the reason he used the December 31, 2003 date as the beginning value for his lost business value calculation was because it was a date before the Subcontract was signed and because there were no other documents available that would provide a picture of what Vernco was worth immediately prior to the termination of the Subcontract. Contrary to Nelson's argument, Burchett testified that he did take the $3.7 million loss reported on the IRS tax return into consideration, but that the loss was an anomaly and that other factors provided a better sense of Vernco's true value prior to the effects of this dispute. Burchett also testified that of various calculation techniques that he could have used to assess lost business value, he chose the most conservative approach. Vernco also points out in its brief that the values Burchett provided in other areas came close to those amounts posited by Nelson and Hood's own valuation *768 experts. While they provide alternate views of data, Nelson points to nothing that would show Burchett's testimony was wholly unreliable.
Burchett's "experience, coupled with his thorough testimony about the methodology he employed, demonstrate that the opinions he drew from the underlying data are reliable." Helena Chem. Co. , 47 S.W.3d at 501. The trial court performed its gatekeeping function and did not abuse its discretion in allowing Burchett to testify about Vernco's lost business value.
But even if we are wrong and even if the trial court did err by admitting Burchett's testimony, we see no basis for reversing the lost business value award on this record. It is true that the availability of cross-examination does not relieve the trial court of its threshold responsibility to ensure that expert testimony rests on a reliable foundation and is reliable. Gammill v. Jack Williams Chevrolet, Inc. , 972 S.W.2d 713, 728 (Tex. 1998). It is also true that we cannot reverse absent a showing of sufficient harm. Tex.R.App.P. 44.1(a)(1). We are not convinced that any erroneously admitted testimony probably caused the rendition of an improper judgment sufficient to allow us to order a re-trial related as to the jury verdict line-item of lost business value. Here, Nelson's numerous complaints about deficiencies in Burchett's analysis were fully explored during cross-examination, thereby reducing harm. Indeed, Nelson presented two alternative damages experts to the jury. The issue was fully and extensively litigated. The jury was aware of differing methodologies and the data underlying the expert's decisions. No harm is apparent from this record.
Lost Profits
We next turn to Burchett's assessment of Vernco's lost profits damages. The jury's verdict contains two line-item findings related to lost profits: (1) the amount of profit lost on force account work and (2) the amount of profit lost on non-force account work.
Hood maintains that the jury's damages verdict rests on legally insufficient evidence because Burchett's testimony on lost profits as to the force account work should have been barred under the rules of evidence because Vernco was not entitled to the FAMs as a matter of law. Nelson also asserts that portions of Burchett's testimony regarding lost profits erroneously included the value of all the FAMs were erroneously admitted, despite the fact that the Vernco Subcontract did not entitle Vernco to those FAMs as a matter of right.
Applicable Law
This Court has summarized the law surrounding the ascertainment of lost profit damages this way:
Recovery of lost profits does not require that the loss be susceptible to exact calculation. Nor is the injured party required to produce in court the documents supporting the lost-profits opinions or estimates. However, he must do more than show that he suffered some lost profits. Indeed, the injured party must show the amount of the loss by competent evidence with reasonable certainty. What constitutes reasonably certain evidence of lost profits is a fact intensive determination. As a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits may be ascertained. The bare assertion that contracts were lost does not demonstrate a reasonably certain objective determination of lost profits. [Internal citations, quotation marks, and alterations omitted].
*769 Rusty's Weigh Scales & Serv., Inc. v. N. Texas Scales, Inc. , 314 S.W.3d 105, 110 (Tex.App.-El Paso 2010, no pet.).
Non-Force Account Work
At the outset, we find that the evidence was legally sufficient to support the jury's lost profit award as to non-force account work, and there was no reversible error in Burchett's testimony or conclusions regarding non-force account work lost profits. Much of Hood's briefing goes to issues surrounding the relationship between breach of contract and lost profits damages. The damages here are tied not to the jury's breach of contract finding, but to the surviving alternative ground of breach of fiduciary duty. Addressing arguments related to breach of contract and lost profits is unnecessary to the resolution of this appeal.
With respect to the amount granted for non-force account lost profit, Hood objects to Burchett's use of Collective Contracting's non-force account profits as an analogue for non-force account profits Vernco would have received had the Subcontract not been cancelled. Hood maintains this approach was inappropriate because it did not consider Vernco's expenses and cost structure in assessing net profit.
The trial court has wide discretion in making evidentiary rulings. We do not find that the trial court abused its discretion by allowing Burchett to testify as to Vernco's non-force account lost profits by using Collective Contracting's non-force account lost profit numbers as his analytical anchor. "Logically, the location, services, personnel, and management of two separate businesses could be so similar that the business and profits of one would serve as a reliable basis for calculating lost profits of the other." Pena v. Ludwig , 766 S.W.2d 298, 303 (Tex.App.-Waco 1989, no writ). Here, Collective Contracting assumed the same Subcontract that had partially been performed by Vernco. The non-force account portion of the verdict represents non-discretionary set monetary amounts that would have been due for the remainder of the work on the Subcontract. Had Vernco remained on the Subcontract, Vernco would have received those amounts. Instead, Collective Contracting assumed the remainder of the work on the same Subcontract and the remainder of the profits. We see nothing improper in the trial court's decision to allow Burchett to testify as to non-force account profits using Collective Contracting's non-force account profits as an analogue.
Force Account Work
We do find error, however, in Burchett relying on the FAM amounts in rendering an opinion as to the lost profits-force-account work line-item. As we held earlier in this opinion, the Vernco Subcontract never explicitly provided for Vernco to receive any FAMs at all. Vernco was contractually entitled to an equitable increase in contract price after making a written claim with Hood, but Vernco never exercised that option, instead choosing to accept the FAM amount that Hood offered without ever making a claim. There was conflicting testimony about Hood paying different subcontractors inconsistent amounts from FAM monies, and certainly some witnesses, even adverse witnesses, believed that Vernco may have been entitled to more FAM money as a matter of course. But Vernco was not, as a legal matter, entitled to those FAMs as a matter of right under these circumstances.
Burchett should not have been allowed to testify that Vernco was entitled to the FAMs, and to the extent the jury rendered a verdict on that inadmissible testimony, the verdict rested on legally insufficient *770 evidence. Likewise, because Burchett's testimony could have suggested to the jury that Vernco was contractually entitled to the FAMs as of right when Vernco was not legally entitled to the FAMs, we find the error to have probably caused the rendition of an improper verdict as to the "lost profits-force account work" line-item.
Nelson's Issue Thirteen is sustained, in part. We deal with the remedy to this issue later in this opinion.
Exemplary Damages: The Malice Finding
(Hood's Issue Twelve; Nelson's Issue Seven)
Having determined that there is a predicate damages award (albeit one that is not as large as the jury granted), we turn finally to the issue of exemplary damages.
Jury Charge Error in Question 22 Regarding Malice
In Nelson's Issue Seven, he complains that the trial court erred by submitting Question 22 over his objection when he offered an instruction that properly set out the appropriate legal standard. He maintains that the malice finding presented in Question 22 was not tied to any particular theory. We disagree. The jury question in Question 22 clearly ties the malice finding to the breach of fiduciary duty finding. This point has no merit.
Nelson's Issue Seven is overruled.
Legal Sufficiency on Malice Finding
In Hood's Issue Twelve, Hood maintains that the jury's malice finding rests on legally insufficient evidence because (1) even though the initial dispute arose when Vernco diverted funds that were supposed to be used to pay suppliers, Hood allowed Vernco to continue on the contract with modifications; and (2) Hood properly exercised its contractual right to terminate the Vernco Subcontract based on the lapse in insurance coverage, which constitutes no evidence of malice. Hood does not cite any legal authorities in this section. Additionally, in a one-sentence tagline at the end of his briefing on Issue Seven, Nelson also contends that the malice question should have never been presented at all because there was no evidence of Nelson having malice toward Vernco. Nelson does not expand on this initial sentence.
We agree with Vernco that the briefing on these points is not enough to assign this issue for our review. Hood's Issue Twelve is overruled.[28]
D.
EVIDENTIARY ISSUES
We have determined that the jury was properly charged on the law. We have also determined that the jury's verdict on the breach of fiduciary duty issue is legally and factually sufficient as to Nelson and Hood, both on the issue of liability and as to all damages except lost profits damages, which we found to be partially supported by legally sufficient evidence. Still, before deciding whether we may affirm the sufficient portions of the jury's verdict outright, we must determine whether several purported evidentiary errors identified by Nelson and Hood so undermined the reliability of the jury's verdict on those issues that we must instead reverse and remand for a new trial.
Standard of Review
We review a trial court's evidentiary decisions for abuse of discretion.
*771 Helena Chem. Co. , 47 S.W.3d at 499. A trial court abuses its discretion when its decision falls outside the zone of reasonable disagreement, or if the trial court acts without reference to guiding principles. Id.
The simple fact that error occurred in a trial does not necessarily mean that appellate reversal of a verdict is warranted. In civil cases, "[n]o judgment may be reversed on appeal on the ground that the trial court made an error of law unless the court of appeals concludes that the error complained of ... probably caused the rendition of an improper judgment[.]" TEX.R.APP.P. 44.1(a)(1). "If the error affects part of, but not all, the matter in controversy and that part is separable without unfairness to the parties, the judgment must be reversed and a new trial ordered only as to the part affected by the error." TEX.R.APP.P. 44.1(b).
Evidence of Vernco's Poor Financial State
(Hood's Issue Six)
In Issue Six, Hood maintains that the trial court wrongly excluded from trial Vernco's bank records, evidence that Vernco failed to pay payroll taxes and other debts, and other evidence of Vernco's "poor financial state." Hood asserts that the exclusion of this evidence was harmful because it "left the jury with a financial picture that at the very least was incomplete, and at worse, false." Hood also argues that the exclusion of these records was prejudicial because it prevented a full cross-examination of Vernco's damages expert.
Hood's briefing on this point is scant. The point is contained in a single paragraph that contains no citations to legal authority. Hood only asserts that "[t]he error probably caused rendition of an improper judgment because the exclusion left the jury with a financial picture that at the very least was incomplete, and at worst, false." Hood also does not explain how the evidence of Vernco's poor financial state prevented it from fully and fairly cross-examining Vernco's expert witness.
"Appellate courts are required to construe briefs reasonably, yet liberally, so that the right to appellate review is not lost by waiver, and in so doing, we should reach the merits of an appeal whenever reasonably possible." Salazar v. Sanders , 440 S.W.3d 863, 872 (Tex.App.-El Paso 2013, pet. denied). "At the same time, an appellate court should not make the appellant's argument for him because the court would be abandoning its role as a neutral adjudicator and would become an advocate for the appellant." Id. Here, the briefing does not alert us to to how the jury would be left with a false impression of Vernco's financial state or why that issue would matter. The issue is waived for lack of adequate briefing.
Hood's Issue Six is overruled.
Extrinsic Evidence of Vernco Subcontract's Meaning
(Hood's Issue Seven)
In Issue Seven, Hood complains that the trial court erroneously admitted evidence regarding the meaning of the Vernco Subcontract when the Vernco Subcontract was, in fact, unambiguous and should have been interpreted as a matter of law. As we held previously, the contract was indeed unambiguous. But because we have reversed and rendered judgment on the breach of contract claim, we find that even if this evidence was improperly admitted, error was harmless as to the remaining breach of fiduciary duty claim.
Hood's Issue Seven is overruled.
*772 Forbearance Agreement as Evidence of Witness Claflin's Bias
(Hood's Issue Eight)
In Issue Eight, Hood argues that the trial court erred in excluding the Forbearance Agreement because it showed that Claflin-Vernco's chief witness-had a financial interest in the outcome of the case. Specifically, the Forbearance Agreement precludes Vernco from recovering in this litigation, but once Vernco's debt to the Bank has been satisfied from the proceeds of this lawsuit, Claflin and the Bank split the remainder of the award. Since Claflin stood to personally gain from this lawsuit, Claflin had a bias as a witness, which rendered the Forbearance Agreement admissible under TEX.R.EVID. 613(b).
Assuming without deciding that the exclusion of this evidence was erroneous, the error was harmless. Hood insists that the jury would not have come to the conclusion it did about the merits of the case if it had known that Claflin's financial interest in the litigation went beyond his indirect interest as a shareholder or principal. But the jury also heard evidence that Claflin was Vernco's personal guarantor. That information would also suggest a financial bias to the jury. It would be natural for the jury to assume that Claflin wanted the Vernco lawsuit to succeed because he stood to be held personally liable for the company's debts. The fact that Claflin would split lawsuit award money, if any remained after Vernco's debts were satisfied, with the Bank probably would not have resulted in a different outcome in this case. Harm is not apparent from the record, and reversal, even in the event that this information should have been admitted, is unwarranted.
Hood's Issue Eight is overruled.
E.
Remedy-What Must Our Appellate Judgment Look Like?
Liability Grounds
The jury's verdict on breach of contract was not supported by legally sufficient evidence. However, the jury's verdict on breach of fiduciary duty as to both Hood and Nelson did rest on legally sufficient evidence. The easiest way to dispose of this change is to reform the judgment to reflect that Hood is liable for knowing participation in Nelsons' breach of fiduciary duty and affirm the liability portion of the judgment as modified. Of course, because attorney's fees are recoverable in a breach of contract case but not in a breach of fiduciary duty case, we must strike the award of attorney's fees from the judgment.
Damages
As for the damages portion of the judgment, we have determined that in all aspects other than the line-item for force account work lost profits, the jury's damages verdict is proper.
The force-account work lost profits line item, submitted as a special issue, is readily severable from the rest of the verdict. Our instinctual response would be to simply strike the lost profits/force account work line-item on legal insufficiency grounds and affirm the remainder of the damages judgment as modified. But the Texas Supreme Court seems to suggest we may not have the power to line-item veto insufficient portions of the jury's lost profits verdict in cases where an expert's method of calculation is readily ascertainable, but his ultimate conclusion is wrong.
It is clear that where there is no evidence to support a damages award at all, the proper course is to reverse and *773 render a take nothing judgment. Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp. , 299 S.W.3d 106, 124 (Tex. 2009). But the Texas Supreme Court has also stated in a case involving a legal sufficiency challenge to a jury's damages verdict that "when there is some evidence of damages, but not enough to support the full amount, it is inappropriate to render judgment." Id. at 124. Rather, "[i]f part of a damages verdict lacks sufficient evidentiary support, the proper course is to suggest a remittitur of that part of the verdict, giving the party prevailing in the trial court the option of accepting the remittitur or having the case remanded for a new trial." Int'lBus. Machines Corp. v. Lufkin Indus., Inc. , No. 12-15-00223-CV, 564 S.W.3d 15, 33, 2017 WL 2962836, at *11 (Tex.App.-Tyler July 12, 2017, pet. filed), supplemented , No. 12-15-00223-CV, 2017 WL 3499951 (Tex. App.-Tyler Aug. 16, 2017).
In Akin Gump , an attorney malpractice case tried to verdict, the jury found that a client prevailed in his malpractice claim against attorneys that failed to request certain jury charge questions in an underlying case, which led the trial court to render judgment against the client despite a favorable verdict from the jury. Akin, Gump , 299 S.W.3d at 111. The malpractice jury awarded damages for among other things (1) the loss of value of certain stocks tied to the case, (2) success fees, and (3) attorney's fees and expenses. Id. The Texas Supreme Court rendered take-nothing judgments on the stock and success fees claims. Id. at 124. However, the Court held that the clients had furnished some evidence to support an award of attorney's fees and expenses, but not in the amount the trial court ordered. Id. at 123-24. The Texas Supreme Court remanded the case to the court of appeals to consider whether to order a remittitur or else remand the case for a new trial on damages. Id. at 124.
Even though the correct award amount appears to be clear to us, striking the insufficient award amount, reforming the judgment, and affirming the judgment as modified may not be within our power here. In a case similar to this case which also involved expert testimony on the issue of lost profits, the Texas Supreme Court found that a trial court's award of $300,000 in lost profits damages exceeded the amount that would have been supportable had an expert witness' method of calculation been properly applied to the properly admissible evidence ($178,601.05). See ERI Consulting Eng'rs, Inc. v. Swinnea , 318 S.W.3d 867, 877 (Tex. 2010). The Texas Supreme Court held that ERI proved lost profit damages, and that "its entitlement to recover them survives the trial court's error in award too much." Id. at 878. The court of appeals had rendered a take-nothing verdict on damages. Rather than rendering a damages judgment of $178,601.05-the readily ascertainable amount of lost profits damages supportable by legally sufficient evidence-the Texas Supreme Court remanded the case to the court of appeals for further proceedings, heavily suggesting that remittitur was the appropriate remedy but that if the court of appeals believed the remittitur amount was not readily ascertainable, the court of appeals could remand for a new trial on lost profit damages "as we might have if the evidence did not seem conducive to remittitur." Id. at 880.
Here, only part, but not all, of the jury's verdict was improper, and only on the issue of damages. Therefore, we propose a damages remittitur of $2,122,978.00-the amount the jury awarded for lost profits on force account work. If Vernco accepts the suggestion of our remittitur within 15 days of the date of the issuance of this *774 opinion, we will reform the judgment to reflect a final award that is $2,122,978.00 less than the amount provided by the original judgment, and affirm the judgment as modified. Vernco can accept the remittitur suggestion while still reserving the right to seek discretionary review of our legal determination on this issue before the Texas Supreme Court. Rose v. Doctors Hosp. , 801 S.W.2d 841, 847-48 (Tex. 1990) ; Corral-Lerma v. Border Demolition & Envt'l, Inc. , 474 S.W.3d 481, 482 (Tex. App.-El Paso 2015), modifying judgment in 467 S.W.3d 109 (Tex.App.-El Paso 2015, pet. denied).
If Vernco does not accept our suggestion of remittitur within fifteen days, then the judgment of the trial court shall be reversed as to damages, and we will remand the cause to the trial court for a new trial on lost profit damages. All other damages awards will remain intact. See ERI Consulting Eng'rs, Inc. , 318 S.W.3d at 880 (the lost profits inquiry is an inquiry that is separate and discrete from other damages issues like punitive damages).
Nelson's Issue Thirteen is sustained, in part, and overruled, in part.
III.
CONCLUSION
Vernco prevailed against Hood and Nelson on breach of fiduciary duty grounds, but not on breach of contract or other grounds. We will reform the judgment to reflect that Hood is liable for knowing participation in Nelson's breach of fiduciary duty, rather than breach of contract. We render judgment that Vernco take nothing against Hood for attorney's fees, since attorney's fees are not recoverable in connection with a claim for breach of fiduciary duty. We affirm the remainder of the trial court's liability judgment as modified.
The judgment is legally sufficient as to damages, but only in part. We exercise our power under TEX.R.APP.P. 46.3 to suggest a remittitur in the amount of $2,122,978.00. Vernco has 15 days from the date of this opinion's issuance to accept remittitur. If remittitur is accepted, the judgment of the trial court will be reformed to reflect an actual damages award of $1,702,758.00, and we will affirm the judgment as modified. If Vernco does not accept remittitur within that period of time, the judgment will be reversed in part as to the issue of lost profits, and this will be remanded for a new trial on the issue of lost profit damages. In all other respects, the judgment of the trial court is affirmed.
Hughes, J. (Not Participating)
SUPPLEMENTAL OPINION
In our opinion dated May 31, 2018, we suggested a remittitur of $2,122,978.00, representing breach of contract damages for force account work that was unsupported by legally sufficient evidence. We stated that if remittitur were filed by Appellee Vernco Construction within fifteen days of the date of the opinion, we would modify the judgment with respect to this amount and affirm the judgment as modified.
In response, on June 8, 2018, Vernco filed two documents in this Court: an "Acceptance of the Court's Suggestion of Remittitur" and an "Advisory to the Court Regarding the Amount of Actual Damages Remaining After Remittitur" alerting us to a purported arithmetic error in our actual damages calculations.
In its advisory, Vernco contends that we erred by stating that after remittitur, the actual damages award would be $1,702,758.00. Vernco points out that this amount does not include an award of $350,000.00 in damages for Nelson's failure to pursue inefficiency claims. Vernco cautions us that in rendering final judgment *775 (1) the actual amount of judgment should be $2,052,758.00 and (2) this amount should be recoverable jointly and severally against both Hood and Nelson.
We cannot render such a judgment. We take this opportunity to clarify our position and reiterate our understanding of the trial court's judgment.
The Court's Initial Calculations Were Not Erroneous
As we noted in our initial opinion, while the jury's verdict authorizes joint and several liability against Hood and Nelson for this amount, the trial court's judgment does not. Instead, the trial court's judgment only allows Vernco to recover against Hood individually for lost profits damages ($1,191,758.00 for non-force account work and $2,122,978.00 in force account work) and lost business value damages ($511,000.00). See Nelson v. Vernco Constr., Inc., 566 S.W.3d 716, 738-41, No. 08-10-00222-CV, 2018 WL 2440773, at *9-*10 (Tex.App.-El Paso May 31, 2018, no pet. h.).
Our judgment eliminates the lost profit damages line-item as to force account work, leaving the non-force account work lost profits and lost business value actual damages being recoverable against Hood individually for an amount that totals $1,702,758.00. Per the remaining unaltered terms of the trial court's judgment, the $350,000 for lost inefficiency claims remains jointly and severally recoverable against both Hood and Nelson.
No Ability to Make Judgment Jointly and Severally Enforceable Absent a Cross-Appeal from Vernco; No Just Cause Shown
To the extent that Vernco asks this Court to impose liability on Nelson beyond the $350,000.00 authorized by the trial court's judgment, we lack the ability to do so. While the Texas Rules of Civil Procedure required the trial court to issue a judgment that "conform[ed] to the ... verdict ... and shall be so framed as to give the party all the relief to which he may be entitled either in law or equity[,]" TEX.R.CIV.P. 301, "[t]he appellate court may not grant a party who does not file a notice of appeal more favorable relief than did the trial court except for just cause." TEX.R.APP.P. 25.1(c). An appellee who is satisfied with the trial court's judgment need not file a cross-appeal in order to urge us to affirm the judgment, but an appellee that seeks to alter the judgment and obtain relief beyond that which was authorized in the trial court must file a notice of appeal in the appellate court. City of Brownsville ex rel. Pub. Util. Bd. v. AEP Tex. Cent. Co. , 348 S.W.3d 348, 358 (Tex.App.-Dallas 2011, pet. denied).
In our initial opinion interpreting the trial judgment's decretal clauses, we noted that the trial court's judgment inclusion of certain terms from the verdict and not others was a deliberate result of post-judgment litigation "and not simply a clerical error amenable to correct via a judgment nun pro tunc." Nelson , 2018 WL 2440773, at *10. To the extent the trial court erred by granting Vernco less than all the relief to which it was entitled against Nelson, Vernco as Appellee was required to file a cross-appeal if it sought to increase its recovery beyond what was authorized by the trial court's judgment. While this Court retains the ability to grant relief on an appellee's request for alteration of the trial court's judgment in the absence of a notice of cross-appeal if just cause is shown, TEX.R.APP.P. 25.1(c), we find no just cause here, given that the trial court's judgment was subject to extensive post-verdict litigation and given that the trial court's judgment appears to *776 closely track large portions of a proposed judgment submitted by Vernco itself.
Final Judgment
To the extent our initial opinion was unclear as to the amount of relief being granted, we clarify our judgment as follows:
AGAINST HOOD INDIVIDUALLY:
$1,852,758
AGAINST HOOD AND/OR NELSON (JOINTLY AND SEVERALLY):
$350,000[1]
AGAINST NELSON INDIVIDUALLY:
$150,000[2]
Plus, applicable pre-judgment and post-judgment interest; trial court costs, and half of appellate costs.
Conclusion
Vernco Construction has timely accepted the remittitur and asked the Court to modify the trial court's judgment consistent with our opinion and judgment in this matter while reserving its right to appeal our remittitur decision under Rose v. Doctors Hosp. , 801 S.W.2d 841, 848 (Tex. 1990).
Accordingly, we vacate our judgment, but not our opinion, dated May 31, 2018. We modify the trial court's judgment to (1) reflect that Appellant E.E. Hood is liable for knowing participation in Appellant David Nelson's breach of fiduciary duty, rather than breach of contract; (2) delete the award of attorney's fees; and (3) reflect an award of actual damages against Hood individually in the amount of $1,702,758.00 and $150,000.00 in exemplary damages for a total of $1,852,758.00. We affirm the remainder of the trial court's judgment as modified, and render judgment against Appellants and their sureties on the Appellants' supersedeas bonds, if any. TEX.R.APP.P. 43.5. Appellants and their sureties and Appellee are ordered to each pay their respective one-half (1/2) costs of this appeal. This Court's opinion of May 31, 2018, otherwise remains in effect. All other relief is denied.
June 22, 2018

We hear this case on transfer from the Fourth Court of Appeals in San Antonio by order of the Supreme Court of Texas. We apply Fourth Court precedent in accordance with Tex.R.App.P. 41.3.

Generally speaking, force account, as used in this context, "is the payment method used for extra work if the contractor and Engineer are unable to negotiate prices for revised Work." See Construction Tools, Force Account, Minn. Dep't of Transp. , http://www.dot.state.mn.us/const/tools/forceaccount.html.
Force account work, also known as work-by-force account, or time and material work, is a payment method for construction work where there is no existing agreement on cost.
In this case, the works are undertaken with the understanding that the client will pay the contractor according to the actual cost of their labour, materials, and equipment, with an additional percentage for overheads and a mark-up for profit.
It can be used when the contractor and client are unable to agree a unit price or lump sum amount, or if these methods are impracticable, for example, when the quantities and scope of work are unknown at the time of tendering, or for a change order requiring extra, unforeseen work identified after construction has already begun.
See Force account work, Designing Buildings Wiki (Jan. 24, 2017), https://www.designingbuildings.co.uk/wiki/Force_account_work; see also Force account work, Online Business Dictionary , http://www.businessdictionary.com/definition/force-account-work.html ("Contracted construction work paid-for on the basis of time taken and material consumed."). [Emphasis in orig.].

Although this agreement purported to be effective September 1, 2006, Nelson did not acknowledge it before a notary until February 13, 2007.

The jury charge refers to the Vernco Subcontract as "the Applewhite Subcontract." We use the phrase Vernco Subcontract in our opinion for clarity's sake because there are numerous parties involved in this dispute.

Questions 4, 5, 6, and 7 all dealt with the issue of whether after signing the Subcontract, Vernco and Nelson came to a subsequent oral agreement on January 28, 2005 "that included terms that Vernco would consent to Nelson (and any successor corporation/entity formed by Nelson) completing the utility subcontract in exchange for a split of net proceeds from completion of the Applewhite Project ..." and if so, whether there was a breach of that agreement and damages. Because these questions were contingent on a "no" answer from the jury on Question 1, the jury did not answer these questions.

Vernco settled with Koenning and Insurance One prior to trial, but they were still included in the verdict assessment as designated responsible third parties.

Not including $30,000.00 contingent attorney's fee award for appeal.

Judgments contain two types of clauses: recital and decretal. Alcantar v. Okla. Nat'l Bank , 47 S.W.3d 815, 823 (Tex.App.-Fort Worth 2001, no writ). "The factual recitations or reasons preceding the decretal portion of a judgment form no part of the judgment itself."Id. "Moreover, where there appears to be a discrepancy between the judgment's recital and decretal paragraphs, a trial court's recitals, which precede the decretal portions of the judgment, do not determine the rights and interests of the parties." Id. "Rather, the decretal provisions in the judgment control." Id.

Where two claims are "the proximate or producing cause of the same damages[,]" an award damages on both claims "would be necessarily predicated upon the same findings of actual damages and would amount to a double recovery" unless there are "separate and distinct findings of actual damages" as between the two claims. Birchfield v. Texarkana Mem. Hosp., 747 S.W.2d 361, 367 (Tex. 1987).

Trial in this case lasted nearly two months. There are 53 volumes of reporter's records filed in this appeal. The clerk's record has seven volumes and runs 2,653 pages.

The Associated General Contractors of Texas, Inc. (AGT), a contractors' trade organization that "advocate[s] competitive bidding and honest performance of contracts and subcontracts by its members," has also submitted an amicus curiae brief. Hood is a member of AGT. AGT's points are (1) failure to maintain insurance coverage constitutes a material breach of contract, and (2) the damage models advanced by Vernco related to the breach of contract were incorrect and the jury erred by relying on them.

For example, many of the sub-points presented in several overarching issues in fact raise separate errors under one generalized heading. When all sub-issues of Hood's brief are taken as separate points, Hood's brief alone presents fifty-two discrete issues for our review:
• Issue Two challenges the legal and factual sufficiency on nine sub-points, meaning that Issue Two actually presents eighteen issues rather than a single issue (9 x 2 = 18).
• Issue Three challenges the legal and factual sufficiency on five sub-points, meaning that Issue Three actually presents ten issues rather than a single issue (5 x 2 = 10).
• Issue Four challenges the legal and factual sufficiency on four sub-points, meaning that Issue Four actually presents eight issues rather than a single issue (4 x 2 = 8).
• Issue Nine dealing with one question in the jury charge lists eight sub-points (8) with each detailing a separate error.
• The remaining issues-Issue One, Five, Six, Seven, Eight, Ten, Eleven, and Twelve-present eight (8) issues for our review.

Even if the authorization issue were cognizable as a facet of standing, Hood and Nelson's argument still fails. Appellants insist that the Forbearance Agreement conclusively establishes that Vernco holds no legal interest in this claim because Vernco assigned everything to the Bank. Hood and Nelson also urge the Court to hold that the Addendum could not modify the Forbearance Agreement so as to retroactively grant Vernco an ownership interest sufficient to create subject-matter jurisdiction. But we need not address whether the Forbearance Agreement gives Vernco an "ownership interest" in the claim it assigned to the Bank, a non-party in this proceeding. Even if the Forbearance Agreement assigned all of Vernco's interest and obligations, the Addendum is sufficient, standing alone, to show that the Bank authorized Vernco to proceed as its agent, prosecuting this lawsuit on the Bank's behalf. That is sufficient to uphold this suit. "In Texas the plaintiff may, with the authority and consent of the subrogee-assignee, sue upon a cause of action which he has totally transferred, where he sues for the use and benefit of such transferee."Fort Worth & Denver Ry. Co. v. Ferguson , 261 S.W.2d 874, 880 (Tex.Civ.App.-Fort Worth 1953).

Hood's Issue Two is a textbook study in multifariousness. By embracing a set of subissues labeled "a" through "i," Hood's Issue Two actually presents nine separate issues (technically eighteen if you consider legal and factual sufficiency as separate inquiries) for this Court's review shoehorned into one overarching topic area. We quote Hood's Issue Two as set out in the Issues Presented section of its brief verbatim:
2. Did the trial court err in refusing to disregard the jury's answers to Questions 1, 2 and/or 3 and in rendering judgment against Hood on Vernco's contract claims [i.e., the evidence is legally insufficient], or alternatively by denying Vernco's motion for new trial [i.e. the evidence is factually insufficient], because:
a. Vernco failed to obtain a jury finding on each element of its claim that Hood breached the Hood-Vernco Subcontract by terminating Vernco from the Applewhite Project;
b. the written contract between Hood and TxDOT did not give Vernco the right to force account markups or require Hood to give Vernco any force account;
c. Vernco failed to obtain a jury finding that Vernco and Hood had an agreement regarding payment of force account markups beyond the 55% labor burden that all parties admitted Hood agreed to pay and did pay Vernco;
d. Vernco failed to obtain a jury finding regarding the terms of any such agreement;
e. Vernco failed to obtain a jury finding regarding the only element of damage recoverable for failure to pay additional force account markups-the difference between the amount of force account markups actually paid and the amount Vernco alleged should have been paid-and thus cannot recover for any alleged failure to pay additional force account markups;
f. as a matter of law, Vernco cannot recover 'benefit of the bargain damages,' which were the only contract damage measures submitted, because it is undisputed that Vernco did not fully perform its contractual obligations and did not obtain a jury finding that its undisputed breach was excused;
g. there is no evidence, or alternatively factually insufficient evidence, that any lost profits or loss of value of Vernco as a business were proximately caused by Hood's failure to pay additional force account markups prior to January 21, 2005;
h. there is legally insufficient evidence, or alternatively factually insufficient evidence, to support the amounts awarded by the jury with regard to lost profits on force account work, loss profits on non-force account work, and loss of Vernco's value as a business; and/or
i. There is no evidence that Vernco presented its contract claim to Hood for payment at least 30 days before trial, and thus Vernco cannot recover attorney's fees as a matter of law.
Likewise, Hood's Issue Nine asks "Did the trial court commit harmful charge error with respect to Question 1," i.e. the jury question related to breach of contract. Issue Nine, in turn, contains subissues (a) through (h) alleging various errors related to Question 1. This multifarious issue actually presents eight separate issues for this Court's review. The body of Hood's brief examines some of these issues in much more depth than others.
Above all else, the appellate briefing rules "serve a claims-processing purpose, and particularly in cases regarding technical subject matter" such as this one, "good briefing matters." Brazos Elec. Power Coop., Inc. v. Tex. Comm'n on Envt'l Quality , 538 S.W.3d 666, 700 (Tex.App.-El Paso 2017, pet. filed). Briefs are meant to acquaint the Court with a case's subject matter. Briefs should not require the Court "to connect unrelated dots, hunt down relevant authority, or speculate as to what exactly it is a party is attempting to argue or what relief it is requesting"-we should not be placed "in the position of having to guess what a litigant means[.]" Id. at 700. Even where briefs may comply with the technical mandates of Tex.R.App.P. 38.1, briefs that present multiple issues that do not neatly track with arguments raised in the body of the brief can delay a case's resolution.
Multifariousness is a recognized briefing error that justifies a court of appeal finding waiver as to that issue, even sua sponte. See Shull v. United Parcel Serv. , 4 S.W.3d 46, 51 (Tex.App.-San Antonio 1999, pet. denied). Although the Court retains the discretion to read Hood's Issues Two and Nine as being briefing-waived on multifariousness grounds, and while we would be justified in exercising that discretion here, we will decline to exercise that power. Instead, we will dispose of all twenty-seven issues (eighteen legal/factual sufficiency points and nine jury charge errors) Hood raises that are germane to the breach of contract question, but we will only address only those adequately briefed arguments necessary to the resolution of this appeal. Tex.R.App.P. 47.1.

A party's obligations under a contract and potential remedies arising from a breach of contract all hinge on whether the portion of the contract breached was conditional or covenantal. "A condition precedent is an event that must happen or be performed before a right can accrue to enforce an obligation." Centex Corp. v. Dalton , 840 S.W.2d 952, 956 (Tex. 1992). "A condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due." Solar Applications, Eng'g, Inc. v. T.A. Operating Corp. , 327 S.W.3d 104, 108 (Tex. 2010) (citing Restatement (Second) of Contracts § 224 (1981) ). "A covenant, as distinguished from a condition precedent, is an agreement to act or refrain from acting in a certain way." Id. As the Texas Supreme Court explained in Solar Applications Engineering :
Breach of a covenant may give rise to a cause of action for damages, but does not affect the enforceability of the remaining provisions of the contract unless the breach is a material or total breach.... Conversely, if an express condition is not satisfied, then the party whose performance is conditioned is excused from any obligation to perform. [Internal citations omitted].
Id. at 108.

Vernco argues that "we should strive to construe a flow down provision in a manner consistent with other jurisdictions because those provisions are commonly used in construction contracts across jurisdictions." Tribble & Stephens Co. , 154 S.W.3d at 663 n.33 (Seymore, J., plurality op.). The value of this statement in Tribble , even as persuasive authority, is questionable. In Tribble , a three-judge panel split three ways-one judge authored a plurality opinion, the second judge concurred in the judgment only without joining in the plurality opinion, and the third judge dissented. A footnote in a plurality opinion that was not joined by a majority of the panel deciding the case is a thin reed to rest on, particularly when that footnote indirectly points us toward reading an implied covenant into a contract based on a broad precept of Alaskan law that does not appear to find footing anywhere else in Texas case law.

The trial court did submit a question to the jury about whether a subsequent oral modification of the Vernco Subcontract occurred that would have entitled Vernco to the FAMs. But the question regarding a subsequent contract was contingent on a "no" answer from the jury on the question of whether the Vernco Subcontract directly entitled Vernco to the FAMs. The jury answered "yes" to that question, meaning there was no jury answer on any subsequent oral modifications. Given the lack of a jury answer on that issue, and given that Vernco does not advance that theory as a basis for affirming the jury's award, we find that any questions on contract modifications are beyond the reach of this Court.

We note that while the jury found Nelson liable for tortious interference with the Vernco Subcontract, as a technical matter, the decretal portions of the trial court's judgment do not appear to actually grant Vernco any relief against Nelson on this claim. As such, we question whether we even have jurisdiction to entertain Nelson's challenge to this aspect of the verdict, since even if Nelson is correct, there is no relief to grant. We address this issue in case we are in error as to what the trial court's judgment actually grants.

Hood's Issue Three, which contains five sub-issues, reads:
3. Did the trial court err in refusing to disregard the jury's answers to Questions 14 and 17 and in rendering judgment against Hood on Vernco's claim for alleged knowing participation in David Nelson's alleged breach of fiduciary duty [i.e., the evidence is legally insufficient], or alternatively by denying Hood's motion for new trial [i.e., the evidence is factually insufficient], because:
a. there is no evidence, or alternatively factually insufficient evidence, that David Nelson failed to comply with any fiduciary duty he owed to Vernco;
b. there is no evidence, or alternatively factually insufficient evidence, that Hood had actual knowledge that Nelson was failing to comply with a fiduciary duty Nelson owed to Vernco;
c. there is no evidence, or alternatively factually insufficient evidence, that Hood assisted or encouraged Nelson to fail to comply with any fiduciary duty Nelson owed to Vernco;
d. Vernco failed to obtain a jury finding that any assistance or encouragement Hood provided with regard to any breach of fiduciary duty by Nelson was 'substantial'; and/or
e. there is no evidence, or alternatively factually insufficient evidence, that any 'assistance' or 'encouragement' Hood provided was substantial?

Because we find these factors are sufficient to uphold the breach of fiduciary duty liability finding, we will not discuss whether Nelson's alleged failure to file inefficiencies related to the previous Pat Booker Project also could support a finding of breach of fiduciary duty. We will, however, address damages issues related to those inefficiency claims later on in this opinion.

The distinction between being a knowing participant in another's breach of fiduciary duty and being a co-conspirator in a civil conspirator are unclear. Hunter Bldgs. & Mfg., L.P., 436 S.W.3d at 15. Both provide for joint and several liabilities among the parties. Id.

In Hood's Issue Ten, Hood asserts that the trial court erred by failing to submit a jury charge that explained that any assistance or encouragement by Hood had to be "substantial." This argument does not appear in the body of Hood's brief. As such, we find Hood's Issue Ten has been waived.

Hood's Issue Four, which embraces four sub-issues, states:
4. Did the trial court err in refusing to disregard the jury's answers to Questions 19, 20, and 21, and in rendering judgment against Hood on Vernco's fraud claim, or, alternatively by denying Hood's motion for new trial, because:
a. there is no evidence, or alternatively factually insufficient evidence, that Hood made any false statement of fact to Vernco;
b. there is no evidence, or alternatively factually insufficient evidence, that Vernco relied upon any false statement of fact made by Hood and thereby suffered injury;
c. there is no evidence, or alternatively factually insufficient evidence, that Hood made a promise of future performance with the intent, at the time the promise was made, not to perform as promised; and/or
d. there is no evidence, or alternatively factually insufficient evidence, that any lost profits on force account work, lost profits on non-force account work, and/or loss of Vernco's value as a business were proximately caused by any fraud on Hood's part?

As with the tortious interference cause of action, we again note that while the jury found Nelson and Hood liable for fraud/conspiracy to defraud, as a technical matter, the decretal portions of the trial court's judgment do not appear to actually grant Vernco any relief against Nelson or Hood on this claim. We again question whether we even have jurisdiction to entertain Nelson and Hood's challenges to this aspect of the verdict in the technical absence of an adverse judgment on these claims. We also note that the relief granted for fraud is the same relief granted for breach of fiduciary duty, meaning that even if we do have jurisdiction, discussion of the fraud findings are not strictly necessary to the resolution of the appeal, since double recovery of damages is impermissible and recovery of the same damages is permissible on an alternate ground. Nevertheless, we address the fraud/conspiracy issue in case we are in error about these assumptions.

Vernco alleged that Hood and Nelson were part of a joint conspiracy to commit fraud. "An actionable civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. The essential elements are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." Operation Rescue-Nat'l v. Planned Parenthood of Hous. and Se. Tex., Inc. , 975 S.W.2d 546, 553 (Tex. 1998). "For the alleged conspirators to have a 'meeting of the minds,' there must be an agreement among them and each must have a specific intent to commit the act." San Antonio Credit Union v. O'Connor , 115 S.W.3d 82, 91 (Tex.App.-San Antonio 2003, pet. denied). "For specific intent to exist, the parties must be aware of the harm or the wrongful conduct at the beginning of the agreement and intend to cause that harm." Id.

Consequential damages are also referred to as "special damages." See DaimlerChrysler Motors Co., L.L.C. v. Manuel , 362 S.W.3d 160, 180 (Tex.App.-Fort Worth 2012, no pet.).

"Special damages are those that proximately result from the defendant's wrongful conduct but are of such an unusual nature that they would normally vary with the circumstances of the individual case in which they occur." Burke v. Union Pac. Res. Co. , 138 S.W.3d 46, 66 (Tex.App.-Texarkana 2004, pet. denied).

In Hood's Issue Eleven, Hood complains that the trial court committed harmful charge error by failing to include an exemplary damages instruction requested by Hood. Hood does not elaborate on this point in the body of its brief. Hood's Issue Eleven is waived.

Actual damages-failure to file inefficiency claims.

Punitive damages.